**BURTON-DIXIE CORPORATION, John G. Sevcik, A. T. Burton, George S. Knott, Oscar D. Wiley and Ira W. Spackey, Petitioners,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

No. 11570.

United States Court of Appeals Seventh Circuit.

Jan. 10, 1957.

James E. S. Baker, Kenneth F. Burgess, Arthur R. Seder, Jr., Chicago, Ill., Sidley, Austin, Burgess & Smith, Chicago, Ill., of counsel, for petitioners.

Robert B. Dawkins, Asst. Gen. Counsel, Alvin L. Berman, Atty., Federal Trade Commission, Washington, D. C., Earl W. Kintner, Gen. Counsel, for Federal Trade Commission.

Before DUFFY, Chief Judge, and MAJOR and LINDLEY, Circuit Judges.

MAJOR, Circuit Judge.

This is a petition under Section 5(c) of the Federal Trade Commission Act, 15 U.S.C.A. § 45(c), to review and set aside an order of the Federal Trade Commission (hereinafter referred to as the Commission), issued June 30, 1955, ordering petitioner Burton-Dixie Corporation (hereinafter referred to as Burton-Dixie) and certain of its officers to cease and desist from misrepresenting the identity of the type of filling material contained in its feather and down products or of the proportions of each type when the filling material is a mixture of more than one kind or type.

The proceeding was commenced by the issuance of a complaint on October 28, 1953, which alleged that petitioners are engaged in the business of manufacturing and selling down and feather products, including pillows, to dealers for resale to the general public and are carrying on such business in interstate commerce in competition with others similarly engaged. The complaint further alleged that petitioners affix labels to their pillows purporting to state the kinds or types and proportions of filling materials contained therein; that typical of the representations as to the kind of such pillows are the statements:

"Trade Name of Pillow
'Countess'—

> All new material consisting of Down

'Chatham'—

> All new material consisting of 50% Crushed Chicken Feathers, 50% Crushed Duck Quill Feathers

'Spring'
'Keystone'—

> All new material consisting of 50% Crushed Goose Quill Feathers, 50% Crushed Turkey Feathers."

The complaint charged that these representations are false, misleading and deceptive in that the "Countess" pillows contain substantial quantities of material other than down; the "Chatham" pillows contain substantially less than 50% crushed chicken feathers and substantially less than 50% crushed duck quill feathers, and the "Spring" and "Keystone" pillows contain substantially less than 50% crushed goose quill feathers and substantially less than 50% crushed turkey feathers. The complaint charged that these false, misleading and deceptive representations have the tendency and capacity to deceive dealers and the purchasing public as to the filling material of the pillows and to induce the purchase of substantial quantities of pillows because of such mistaken and erroneous belief; that as a result, substantial injury has been done to competition in commerce. Petitioners' practices were alleged to constitute unfair methods of competition and unfair and deceptive acts and practices within the meaning of the Federal Trade Commission Act.

Petitioners by answer admitted the jurisdictional averments of the complaint and that their pillows were labeled as alleged, but denied all other material allegations.

Hearings were had before a designated Examiner of the Commission who, on December 3, 1954, issued his initial decision containing findings of fact, with his conclusions and an order that the complaint be dismissed. Counsel supporting the complaint appealed to the Commission from the Examiner's decision. After hearing the matter on the record, briefs and oral argument of counsel, the Commission rendered its decision, reversing the initial decision of the

Examiner. Thereupon, the Commission issued its cease and desist order now under attack.

The instant action was one of eleven proceedings brought by the Commission, involving the feather and down products industry, ten of which were contemporaneously heard, considered and decided by the same Examiner. These related proceedings covered practically all pillow production in the industry. All ten cases heard by the Examiner were appealed to the Commission. In the instant case and in two others in which the complaints had been dismissed, the Commission reversed the decisions of the Examiner and issued cease and desist orders. As to the other seven cases, the Commission sustained the Examiner's issuance of similar orders. Thus, the Commission sustained the charges against each manufacturer without exception and irrespective of the conclusion of the Examiner in the separate cases.

The primary issues on this review are two: (1) Whether the decision by the Commission that Burton-Dixie misrepresented the filling content of its down pillows, contrary to the findings of the Examiner, is supported by substantial evidence. This issue involves a number of subsidiary questions which we shall subsequently consider. (2) Whether the decision of the Commission that the contents of Burton-Dixie's crushed feather pillows were misrepresented (a) has any probative evidentiary support and (b) comports with the requirements of the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., and the Commission's own rules of procedure.

Prior to a consideration of the issues, it appears pertinent to make some statement relative to the nature of feather and down products, together with the processing methods employed, about which there seems to be no dispute. Raw feathers are procured principally from Oriental and European sources of supply. In Europe, second-hand feathers are customarily mixed with new stock, while in the Orient there is no careful sorting, so that "a bale of feathers purchased as goose feathers may contain substantial quantities of duck or chicken feathers." After purchasing raw feathers, Burton-Dixie draws samples so as to insure that the stock contains the type of feathers represented, within acceptable limits.

The feathers are thoroughly washed, sterilized and dried, after which they are separated by mechanical means. The separator consists of five chambers divided by baffles of varying heights. The feathers are blown upwards by air currents, with the result that down and the lighter feathers are blown over the higher baffles while heavier feathers remain in the compartments separated by lower baffles. At the end of this process, the farthest compartment contains approximately 90% down and 10% small feathers; the next compartment contains about 80% very small feathers and approximately 20% down; the third chamber contains somewhat larger body feathers with approximately 5% down; the fourth contains large body feathers with almost no down; and the fifth contains wing and tail feathers, commonly known as quills. While it is possible in this manner to isolate a high percentage of down, it is physically impossible to separate some of the small, unmatured feathers from the down or to separate feathers according to type of fowl.

Pillow production falls generally into three types: (1) the down pillow, which is always recognized to contain some light feathers, (2) the mixed whole feather or whole feather and down pillow, and (3) the crushed feather pillow. The instant case involves pillows of the first and third types.

Pillows are never filled singly but in batches. In filling a batch of down pillows, the down is taken from the separator and blown into a steamer, where it is agitated with paddles and live steam. From the mixing steamer, the material is blown into bins, and from these bins the pillows are filled by means

of suction blowers. While the content of each pillow thus depends in part upon the mixture in the filling bin as a whole, it will vary from pillow to pillow despite the exercise of the greatest care.

The reason for this result is that feathers and down are unique in their lack of uniformity or homogeneity. They do not mix well. When mixed, they do not stay mixed. Thus, when blown into the filling bin, the feathers have a tendency to sift to the bottom of the bin and the down to the top, so that pillows filled from different parts of the bin always contain different proportions of the materials in the bin. The Examiner stated in this regard:

"The exact amount or proportion of down and feathers going into any particular pillow cannot be controlled by any mechanical means. The expert whose testimony was presented in support of the complaint stated that the contents of pillows filled from the same bin will vary as much as 30%; that the same percentage will not be found in any two pillows; that the mixture in each pillow will vary from the mixture in the filling bin; that if any one pillow should contain exactly the same percentage of feathers and down as that originally placed in the filling bin it would be pure accident; and that the closest practical indication of the contents of a pillow product of a manufacturer and the correctness of its labeling will result if several different pillows are sampled, preferably pillows obtained at different times and places."

The crushed feather pillow is the least expensive product made by the industry from new material. This filling material consists of chicken and turkey feathers and waterfowl quills that would not otherwise be suitable for pillows, which are twisted and curled in a machine to increase their resiliency and prevent matting. A mixture of crushed feathers is made by first weighing the proper proportions of the various kinds of feathers that are to be mixed and then placing alternate handfuls of these feathers into the hopper of the crushing machine, after which the material goes into a filling bin from which the pillows are filled in the manner described above. With respect to this operation, the Examiner stated:

"Because of the nature of these larger feathers, they frequently go through the hopper in lumps, so that it is impossible to get a mixture with any degree of homogeneity. Despite agitation in mixing, slugs of chicken or turkey feathers and slugs of quill feathers will get into the pillows without ever being separated or mixed. The label 'Crushed Feathers', showing the types of feathers used, can indicate no more than that the mixture was made from the types or kinds of feathers stated on the label."

On April 26, 1951, the Commission promulgated Trade Practice Rules (subsequently referred to as the Rules) for the feather and down products industry. (16 C.F.R.1955 Supp., 200.) At this point we think it appropriate to refer to some of the more salient provisions and requirements contained therein. Rule 3 requires that feather and down products contain a label stating the identity of the filling material. Section III (a) of that Rule, entitled "Tolerance," provides that the filling material of a product may be represented as being of but one kind or type "when 85% of the weight of all filling material contained in the product is of the represented kind or type"; and that when the filling material consists of a mixture of different types, the proportions of which are stated on the label as percentages, the filling material may not vary by more than 15% from the stated percentages. Paragraph (b) of the same section, as to a filling material represented as being wholly of down, provides that any proportion within the tolerance percentage which is not down "shall consist principally of down fiber and/or small, light, and fluffy waterfowl feathers." The Rule further provides: "It is

the consensus of the industry that determination as to whether any representation is violative of the provisions of this Rule should be based on an average of the results of tests of at least two products of the same type when same are readily available for testing * * *." The Rule also contains a formula for testing the filling material by providing "that samples of equal weight and size be drawn from at least three different locations in the product; that such samples be thoroughly mixed; and that a test be made of not less than 3 grams of the mixture."

As already noted, the instant proceeding was one of eleven similar proceedings contemporaneously heard by the Examiner. One of such proceedings is Lazar v. Federal Trade Commission (sometimes referred to as Globe), 240 F.2d 176. Another of such proceedings, Northern Feather Works, Inc., v. Federal Trade Commission, has been reviewed and decided by the Third Circuit Court of Appeals, 234 F.2d 335. Still another, Buchwalter v. Federal Trade Commission, has been reviewed and decided by the Second Circuit Court of Appeals, 235 F.2d 344. Each of those courts denied a petition to set aside the order of the Commission and directed its enforcement. By stipulation, the record before us contains not only the proceedings in the instant case but also those in Globe, as well as portions of the testimony in some of the other cases heard by the Examiner.

The evidence in this and the related proceedings consisted principally of testimony concerning the methods of operation of the feather and down industry, and the testimony of J. Davis Donovan of the Maryland State Health Department, the expert witness retained by the Commission, and of Ernest Anderson, of United States Testing Company, the expert retained by members of the industry, both of whom analyzed samples taken from the pillows selected by the Commission as a basis for its complaint. With respect to the "Countess" (down) pillows manufactured by Burton-Dixie, the analyses submitted by Donovan and Anderson respectively were made from the contents of the same two pillows and were as follows:

| "Donovan | Pillow 1 | Pillow 2 |
|---|---|---|
| "Down | 82.2% | 80.3% |
| Fibers | 1.3% | 2.5% |
| Feathers (small downy type) | 15.7% | 15.7% |
| Pith and scale | 0.8% | 1.5% |
| "Anderson | | |
| "Down and down fiber | 86.2% | 90.7% |
| Waterfowl feathers predominantly duck) | 13.8% | 9.3%" |

The Examiner found, first, that down fiber, which had been stated separately in Donovan's analysis, should properly be counted as part of the down content, and second, that both experts had conducted their analyses in the manner provided by the Rules and were entitled to equal credibility. He, therefore, averaged the four analyses, arriving at an average down content of 85.8%. Since this was within the 15% tolerance prescribed by the Rules, he found and concluded that the charges of misrepresentation against Burton-Dixie as to its "Countess" pillows were not supported by the evidence. It may be noted that these down pillows of Burton-Dixie were the only ones involved in any of the proceedings in which the Examiner found that average down content exceeded 85%.

At the request of the Commission, Donovan also submitted analyses of the contents of four crushed feather pillows, but testified that it is impossible to analyze crushed feathers accurately, and that crushed material is "not worth testing." He also testified that he thought that in the minds of the public there is no distinction between different types of crushed feathers. The Examiner accordingly concluded that the charges were not supported by the evidence and that there is no reliable evidence of any

public interest in distinguishing between the various kinds of crushed feathers.

On appeal, the Commission reversed the Examiner's decision with respect to the down pillows by rejecting the analyses made by Burton-Dixie's expert witness, by accepting those made by the Commission's expert, and by excluding "down fiber" in calculating the percentage of down in the pillows. With respect to the crushed feather pillows, the Commission reversed the Examiner's finding that there was no reliable evidence of any public interest in the labeling of crushed feather products and concluded that the contents of the pillow had been misrepresented on the basis of Donovan's analysis.

As already noted, the Examiner as to the down pillows found that the analyses submitted by petitioners' expert, Anderson, and the Commission's expert, Donovan, were entitled to equal weight and should, therefore, be averaged. The Commission overruled that finding, rejected Anderson's analyses entirely and gave controlling weight to those of Donovan. The Commission in its decision stated: "On the basis of professional qualifications and experience and by comparing testing techniques, the Commission has weighed the expert testimony and evidence and is constrained to adopt as determinative of the questions herein the results of the tests performed under the witness in support of the complaint."

The Commission, in an attempt to justify its reliance upon its own professional expert in preference to that of petitioners, recites in considerable detail the experience of the two witnesses. It is pointed out that Donovan has had some forty years' experience in connection with the feather and down industry, while Anderson has had only five or six years. Donovan's office has made more than a thousand feather analyses while Anderson has made about one hundred. Donovan has two employees who are chemists while Anderson has none, although he is himself a graduate chemist. We need not go further in comparing

their qualifications because after a thorough study of their testimony we are firmly convinced of the soundness of the Examiner's conclusion that their testimony was entitled to equal weight. They both qualified as experts and testified as such. The cross-examination of Anderson by counsel for the complainant, which was only perfunctory in nature, indicates that his qualifications were recognized.

The fact is, so we think, that the importance of expert testimony in this case, due to the nature of the product involved, has been greatly exaggerated. A good part of the process by which feathers are made available for the filling of pillows in their various forms and about which there was so much testimony and discussion is within the knowledge and competency of any person with a reasonable amount of experience in the business. We have heretofore shown the manner in which feathers are treated, from the time of their receipt by the manufacturer until they are used for the filling of pillows. Briefly, the feathers are washed, sterilized and dried, then separated by mechanical means into various compartments. For down pillows, the down is then removed, again by mechanical means, to the filling bin from which the pillows are filled. Certainly up to this point no expertness is required. The Commission in its brief appears to recognize as much because in its argument in favor of the reasonableness of the 15% tolerance rule it states, "The process of separating feathers and down is not difficult."

Thus, expert testimony becomes important only in making an analysis of the samples which have been removed from the accused pillows, which involves the ability to separate and properly characterize the elements contained in such samples. Donovan, after testifying that the separation of feathers is made by picking out each individual feather, was asked, "In making a separation, just what particular scientific knowledge is required, if any?" to which he responded, "Knowledge of the characteris-

tics of the goose feathers, down feathers, chicken feathers, goose down, duck down, and if the article contains an appreciable proportion of fibers, the characteristics of those fibers." We are unable to comprehend that the scientific knowledge thus required can be made to depend upon the number of years a witness has been familiar with the involved problem. In evaluating the testimony of the expert witnesses, we think it should also be kept in mind that due to the special nature of the product involved, all analyses are subject to variation and uncertainty. As the Examiner stated, "* * * the conclusion is inescapable that as a practical matter, the contents of feather pillows cannot be accurately labeled." In this connection, counsel supporting the complaint in his appeal brief before the Commission made the following significant statement, "In reality, the matter of analysis is a chance. No one knows the distribution of a pillow's content in one position or another or after agitation or before."

Petitioners in their brief state, "* * * Donovan testified that, on the basis of tests he had conducted, individual pillows showed as much as 30% variation from the known proportions of feathers and down in the filling bin." The Examiner in his report stated, "The expert whose testimony was presented in support of his complaint stated that the contents of pillows filled from the same bin will vary as much as 30%." The Commission in its brief categorically denies that Donovan so testified. The Commission is in error. The record supports the statement of petitioners and the finding of the Examiner in this respect. As previously shown, Donovan in his analysis did not include "down fiber" as down, while Anderson did. The Commission in its decision states, "In arriving at these results he [Anderson] failed to differentiate between down fiber content and down." There is no justification for this criticism of Anderson. The fact is, as the record overwhelmingly discloses, down fiber has al-

ways been treated and considered by the industry as down. It is not a separate constituent but an inevitable incident of the processing of pure down. It cannot be purchased on the market and it cannot be separated from down by mechanical means. That such is a fact has often been recognized by the Commission's expert witness. In the hearing on the Trade Practice Rules Donovan testified, "They classify it as down on the assumption that it originally was a part of the down. It has just broken away from the down cluster by machine processes." In the instant proceeding he admitted to the Examiner that he did not classify down fiber as down "because for the Federal Trade Commission we followed the Fair Trade Practice Rules, and the instructions that they have adopted as to taking and analyzing samples." More than that, this same expert witness in the Globe case, 240 F.2d 176, included down fiber as down. Why it was excluded in the instant analysis and included in the Globe analysis is not explained.

Pursuing further the same subject matter, the Commission in its decision states, "The evidence is conflicting on whether down fiber should, as a practical matter, be included with down. We resolve that conflict by concluding that the trade practice rule providing that down fiber should not be included as down takes precedence; that the respondents' expert did not comply with those rules in making his analysis and that the hearing examiner was in error when he included downy fiber to arrive at the computed average of down content he did."

This reasoning, in our judgment, is fallacious. There is no conflict in the evidence as to the proper classification of down fiber other than that artificially created by the Commission's expert who refused to classify it as down solely on the basis of his interpretation of the Rules. At this point it appears pertinent to quote a voluntary statement injected into the hearing by the witness Donovan, as follows: "There is another thing

I would like to put in the record and that is that there is a perpetual difference between down and feathers. Down never grows into a feather and feathers never grow into downs. They start from the fowl's body either as down or as feathers and for all the rest of their natural life they continue in that category."

Thus we have a situation where a Rule was utilized by the witness to create a conflict and the same Rule relied upon by the Commission to resolve the conflict. Obviously, there was no occasion to rely upon a Rule to resolve a conflict which did not exist. Assuming *arguendo*, however, that a conflict exists, we think the Commission's reliance upon the Rule is of doubtful propriety. Such reliance is based upon the premise as stated by the Commission, that the Rule provides "that down fiber should not be included as down." We do not so read the Rule. It states that the tolerance percentage (that is, the 15%) "shall consist principally of down fiber and/or small, light, and fluffy waterfowl feathers." The permissive use of down fiber in tolerance is quite different from prohibiting its classification as down. We think petitioners' expert correctly included down fiber as down, which as a matter of fact it was, and that the Examiner was not in error when he included it as such in computing the average of down content.

■ As already noted, the Examiner averaged the four analyses (two by Donovan and two by Anderson) and found an average down content of 85.8%. This average being within the 15% tolerance, he further found that the charges of misrepresentation against Burton-Dixie were not supported. As we understand from the Commission's decision as well as from its brief in this court, the objection to the averaging process employed by the Examiner is based upon the contention that petitioners' expert improperly included down fiber as down. We have shown our disagreement with this contention which renders the objection without force. However, it is pertinent to again point out that the Rule provides that a determination of misrepresentation "should be based on an average of the results of tests of at least two products of the same type when same are readily available for testing * * *." It would seem that the Examiner's action was not only in accordance with this Rule but that it was a fair and reasonable means of determining the issue with which he was confronted. Certainly is this so in view of the uncertain and inconclusive results which may be expected from an analysis, even though made by an expert. Moreover, we find nothing in the record in opposition to the averaging method employed by the Examiner unless it be the statement by Donovan that he would not be willing to average his test with those made by another person. This statement was made by Donovan in the face of his admission that it was quite possible that an analysis of the same pillows by another person would show a substantially higher percentage of down, even up to as high as 90%. Fortunately, the Examiner was not obligated to embrace this egotistical attitude of the Commission's professional and expert witness.

The Commission places considerable reliance upon the decision of the Third Circuit in Northern Feather Works, Inc., supra, and that of the Second Circuit in Buchwalter, supra, wherein cease and desist orders of the Commission were approved in proceedings similar to that involved here. Those cases, of course, were reviewed on a record with which we are not familiar. It is evident from reading the opinions, however, that in the main the questions involved were different from those here. Moreover, they are readily distinguishable on the basis that in each of those cases the Commission accepted and affirmed the findings and conclusions of the same Examiner whose findings and conclusions it rejected and reversed in the instant case.

■■ We are of the firm conviction that the order of the Commission as it

relates to petitioners' "Countess" pillows is not supported by substantial evidence when the record is considered as a whole, including the decision of the Examiner directing a dismissal of the complaint. While we recognize the broad powers of the Commission, we as a reviewing court are also charged with the responsibility of making a determination and deciding if the Commission's order is substantially supported. We cite without discussion cases which so hold. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; United States Steel Co., Joliet Coke Works v. National Labor Relations Board, 7 Cir., 196 F.2d 459; Folds v. Federal Trade Commission, 7 Cir., 187 F.2d 658.

■ We now come to the phase of the case which involves petitioners' pillows designated "Chatham," represented to contain "All new material consisting of 50% Crushed Chicken Feathers, 50% Crushed Duck Quill Feathers," and pillows designated "Spring" and "Keystone," represented to contain "All new material consisting of 50% Crushed Goose Quill Feathers, 50% Crushed Turkey Feathers." Concerning these crushed feather pillows, the Commission referring to the Examiner's decision stated: "As to pillows represented as containing crushed feathers the hearing examiner found no reliable, probative, and substantial evidence to show any public interest either in the matter of labeling or price-listing, or in distinguishing between the various kinds of crushed feather content; that, therefore, there had not been shown any violation of the act through misrepresentation insofar as respondents' 'Chatham', 'Spring' or 'Keystone' pillows are concerned. The charges, in his opinion, not being supported by the evidence and there being no public interest, the hearing examiner dismissed the complaint herein."

Again the Commission reversed the decision of the Examiner, which we think it did without justification. Its finding of substantial proof of mislabeling is based solely on the testimony of Donovan. On this issue, a marked contrast is shown between the attitude of the two expert witnesses—Anderson, whose testimony the Commission brushes aside on his lack of experience, and Donovan, whose testimony is accorded lavish commendation. Anderson, although employed by petitioners and requested by them to make an analysis of the crushed feather pillows, refused to do so for the stated reason that he had learned from experience that such an analysis because of its inaccuracy would be of no value. On the other hand, Donovan, employed by the Commission, made an analysis upon which the Commission relied, which Donovan's own testimony demonstrates was of no probative value. Donovan's procedure for testing the contents of the crushed feather pillows was the same as that employed in testing the down pillows, that is, by removing a quantity of feathers from three positions in the pillow and analyzing not less than three grams. He testified that crushed feathers are even less homogenous than uncrushed feathers and that, when pillows are filled, crushed feathers of one kind come through in lumps and do not mix with crushed feathers of another kind.

Donovan stated that a three gram sample is not likely to be representative of the contents of the pillow as a whole; that it is just chance whether the analyst grabs a lump of turkey or duck quills, and that he had instructed his inspectors not to bring in samples of crushed stock. He was asked, "As a matter of fact, Mr. Donovan, you wrote a letter to Mr. Hafferman of the Burton-Dixie Company a few years ago in which you stated in substance that you did not think it was possible to analyze crushed materials accurately, or words to that effect, did you not?" To this question he responded, "I have held that opinion. I think it is not only a very difficult thing to do, but it is absolutely unnecessary." He was further asked, "In other words, the label describes what

the product is and it means really that the product was made from a batch of material that was prepared in that manner, is that it?" to which he responded, "That is what I would take it to mean."

The Examiner in his decision stated: "In his [Donovan's] opinion, it is impractical to attempt to distinguish between the various types of crushed feathers in any batch of such pillows, and he suggested during the course of his tests for the Commission that no further pillows filled with crushed feathers be sent to him for analysis." The Examiner concluded, "It is impossible to separate and analyze crushed feathers accurately." This conclusion was based upon the testimony of Donovan and was the identical reason assigned by Anderson in his refusal to make an analysis. Under such circumstances, and particularly in view of the admissions by Donovan, we are of the view and so hold that the analysis made by him of the crushed feather pillows does not furnish substantial support for the Commission's decision.

The Examiner, as shown, dismissed the complaint also for the reason that "there is no reliable, probative and substantial evidence to show that there is any public interest either in the matter of the labeling * * *, or in distinguishing between the various kinds of crushed feather content thereof." Relative to this finding the Commission stated in part, "We conclude that the evidence herein is reliable, probative, and substantial as to consumer preference for waterfowl feathers; that the preference can be assumed to carry over to crushed feathers * * *." Thus, the Commission argues that because there was proof as to consumer preference for waterfowl feathers, it may be inferred that the same preference would carry over to crushed feathers. Assuming that such an inference might be permissible under other circumstances, we are not able to discern how it can here be utilized by the Commission, in view of Donovan's testimony. The witness, after testifying that the public had a preference for goose feathers and goose down over duck feathers and duck down, as well as over chicken and turkey feathers, was asked, "Would that preference possibly carry over to crushed goose feathers?" to which he answered, "I don't think that in the minds of the general public there is much of a distinction between any type of crushed feather." Again, Donovan testified to a conversation with a Mrs. Nicholls, an Examiner of the Commission, relative to the testing of the contents of crushed feather pillows. As to that conversation he testified, "I explained to her the extreme tediousness and difficulty of separating the portions of feathers and the fibers and the fact that it was, in my opinion, a waste of time, because there was no material difference either to the processor, the manufacturer or the consumer, the purchaser, in the various types of materials." He further testified, "I tried to dissuade her from having any more pillows of that type collected for examination and report to the Federal Trade Commission."

For the reasons stated, the petition of Burton-Dixie to review and set aside the order of the Federal Trade Commission, issued June 30, 1955, is allowed, and an appropriate order will be entered. As a corollary, the Commission's request that a decree be entered affirming the said order is denied.