**Buryl J. LAZAR, Jorge Lazar and Hattie Lazar, co-partners trading as Globe Feather & Down Company, Petitioners,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

**No. 11569.**

United States Court of Appeals Seventh Circuit.

Jan. 10, 1957.

Marshall M. Holleb, Chicago, Ill., for petitioner.

Robert B. Dawkins, Asst. Gen. Counsel, Federal Trade Commission, Washington, D. C., Earl W. Kintner, Gen. Counsel, Alvin L. Berman, Atty., for Federal Trade Commission.

Before DUFFY, Chief Judge, and MAJOR and LINDLEY, Circuit Judges.

MAJOR, Circuit Judge.

This is a petition under Section 5(c) of the Federal Trade Commission Act, 15 U.S.C.A. § 45(c), to review and set aside an order of the Federal Trade Commission (hereinafter referred to as the Commission), issued June 30, 1955, ordering petitioners Buryl J. Lazar, Jorge Lazar and Hattie Lazar, co-partners trading as Globe Feather & Down Company (hereinafter referred to as Globe), to cease and desist from misrepresenting the identity of the type of filling material contained in its feather and down products or of the proportions of each type when the filling material is a mixture of more than one kind or type.

The proceeding was commenced on June 10, 1954, by the issuance of a com-

plaint by the Commission, naming the above named petitioners as respondents. The complaint alleged that Globe is engaged in the manufacture and sale in interstate commerce of pillows and other products known as feather and down products in competition with other manufacturers and that, in the course of their business, petitioners caused labels to be affixed to Globe pillows containing the following typical statements:

| "Trade Name of Pillow | Statement |
|---|---|
| Little Boy Blue | All new material consisting of imported White Goose Down |
| Manchester | All new material consisting of 50% Goose Down, 50% Goose Feathers" |

The complaint alleged that the representations as to the filling material were false and misleading and had a tendency to deceive dealers and purchasers as to the content of the filling material, thus resulting in injury to competition in commerce and prejudice to the public. It was further alleged that these acts and practices constituted unfair and deceptive acts and practices and unfair methods of competition within the meaning of the Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq.

Globe and the individual petitioners by answer admitted the jurisdictional averments of the complaint and that their pillows were labeled as alleged but denied all other material allegations. Hearings were had before a designated Examiner of the Commission who, on December 17, 1954, issued his initial decision containing findings of fact, together with his conclusions. The Examiner found and so concluded that the charges against petitioners' "Little Boy Blue" pillows had not been sustained but that the charges against the "Manchester" pillows had been, and, accordingly, issued a cease and desist order. Upon appeal, the Commission reversed the decision of the Examiner relating to the "Little Boy Blue" pillows but sustained his decision relating to the "Manchester" pillows, and issued its cease and desist order now under attack.

The action against petitioners was one of eleven proceedings brought by the Commission involving the feather and down products industry, ten of which were contemporaneously heard and considered by the same Examiner. These related proceedings covered practically all pillow production in the industry. One of the related proceedings heard contemporaneously by the Examiner was Burton-Dixie Corporation v. Federal Trade Commission, 7 Cir., 240 F.2d 166, in which a decision has been rendered and an opinion filed simultaneously with the decision and opinion in the instant matter.

The nature of the product involved and the processing method employed by the industry in the manufacturing of various types of pillows, as well as pertinent provisions of the Trade Practice Rules for the feather and down products industry, are set forth in our opinion in Burton-Dixie and need not be repeated. Moreover, the findings, reasoning and conclusions of the Examiner and the Commission in the instant case are similar to those in Burton-Dixie, with such variation as is occasioned by a difference in the facts.

As we pointed out in Burton-Dixie, pillow production falls generally into three types: (1) the down pillow, which is always recognized to contain some light feathers, (2) the mixed whole feather or whole feather and down pillow, and (3) the crushed feather pillow. Burton-Dixie involved pillows of the first and third types, and the instant case those of the first and second types. The controversy in Burton-Dixie revolved largely around the appraisement to be made of the testimony of J. Davis Dono-

van, an expert witness for the Commission, and of Ernest Anderson, an expert witness retained by members of the industry. The same controversy, to a lesser extent perhaps, exists in the instant case, particularly as it relates to petitioners' pillow labeled "Little Boy Blue."

Both expert witnesses tested and submitted an analysis of the contents of the "Little Boy Blue" pillows, using the same process and method as we have shown in Burton-Dixie. The analysis made by Donovan discloses a goose down content (including down fiber) of 80.6% in one pillow and 78.7% in the other pillow. Anderson's analysis discloses down and fiber in one pillow of 89.3% and in the other, 88.8%. We note that Donovan in the instant case included down fiber as down, while in Burton-Dixie it was excluded.

■ Here, again, the Examiner averaged the four analyses (two by Donovan and two by Anderson) and found an average down content of 83.-85%. The Commission here makes the same argument as it did in Burton-Dixie, that down fiber should not be included as down and that the Examiner improperly averaged the four analyses. We rejected that argument in Burton-Dixie, and for the same reason reject it here.

There is this difference, however; in Burton-Dixie the average as found by the Examiner was 85.8% while in the instant case the average was 83.85%. Thus, in the former, the average down content was within the 15% tolerance prescribed by the rules, while in the instant case it was not. Notwithstanding this deficiency in the average down content, the Examiner found compliance. In doing so he stated: "Taking into consideration the numerous variables involved, and the lack of absolute accuracy in any of these tests, this percentage is found not to be substantially outside the reasonable tolerances applicable to pillows of this type, and the conclusion is reached that the charges of the complaint have not been adequately estab-

lished by reliable, probative and substantial evidence as to these pillows."

■ In our view, the Commission was justified in rejecting the conclusion of the Examiner on this phase of the case, even though his reasoning is not without plausibility. It is true, of course, that the nature of the product is such as to create uncertainty and variations in analyses but, even so, the purpose of the 15% tolerance was to make allowance therefor. By this rule, a pillow represented to contain 100% down is in compliance if it contains 85%. In other words, the line between compliance and non-compliance was fixed at a down content of 85%. It is not enough that a manufacturer merely approach this line, he must as a minimum reach it. Any other view would seriously impair the efficacy of the tolerance rule. If the tolerance percent is increased in one case even by 1%, it might in some other case be increased by 3%, or 5%, or even more. The existing confusion and uncertainty would thereby be enhanced rather than diminished.

As to petitioners' "Manchester" pillows, represented to contain 50% goose down and 50% goose feathers, the analysis of the Commission's expert showed an average down content of 36.5%. Anderson submitted no analysis of these pillows. Petitioner Lazar testified mostly concerning the mixture from which these pillows were filled and it is upon this testimony that petitioners rely in support of their contention that the analysis of Donovan should not be accepted. The Examiner, however, gave credence to the testimony of Donovan and, with reference to the average down content as found by him, stated: "This is substantially greater than the allowable, reasonable tolerance of 15%, and cannot be justified. It is concluded, therefore, that these pillows have been mislabeled and that the representations made by respondents in respect thereto are false and misleading."

■ The Commission sustained this finding or conclusion by the Examiner and we think properly so. Petitioners

contend that there is no evidence that the alleged mislabeling in fact deceived or misled anyone or that the proceedings were in the public interest. We approve, without discussion, the findings of the Examiner sustained by the Commission on these issues. Petitioners also contend that the proposed cease and desist order would require the impossible; that it is therefore unreasonable and arbitrary and, consequently, repugnant to the Constitution of the United States as a denial of due process. This contention was advanced and rejected by the Second Circuit in Buchwalter v. Federal Trade Commission, 2 Cir., 235 F.2d 344, 346. We also reject it.

The petition to set aside the cease and desist order is denied, the order is affirmed and an appropriate order will be entered in this court.