# UNITED STATES STEEL CO. (JOLIET COKE WORKS) v. NATIONAL LABOR RELATIONS BOARD.

## No. 10469.

United States Court of Appeals
Seventh Circuit.

April 29, 1952.

Paul R. Conaghan, William W. Fullagar and Douglas F. Stevenson, all of Chicago, Ill. (Knapp, Cushing, Hershberger and Stevenson, Chicago, Ill., of counsel), for petitioner.

Abraham W. Brussell, Milton I. Shadur, and Edwin H. Goldberger, all of Chicago, Ill. (Goldberg, Devoe & Brussell, Chicago, Ill., of counsel), for Joseph Tomasich, et al., amici curiae.

David P. Findling, Associate General Counsel, A. Norman Somers, Asst. General Counsel, Marvin E. Frankel, and George J. Bott, General Counsel, all of Washington, D. C., for respondent.

Before MAJOR, Chief Judge, and KERNER and DUFFY, Circuit Judges.

DUFFY, Circuit Judge.

This proceeding is before the court on a petition to review and set aside an order of the National Labor Relations Board[1] issued against petitioner on July 31, 1951; in its answer the Board requests enforcement of said order.

1. Under Sec. 10, National Labor Relations Act, 29 U.S.C.A. §§ 151–166, as amended by the Labor-Management Relations Act, 1947, 29 U.S.C.A. §§ 151–166.

The petitioner, United States Steel Company,[2] owns and operates the Gary Steel Works at Gary, Indiana. The Joliet Coke Plant, located near Joliet, Illinois, is a department of Gary Steel Works. The Joliet Plant consists of four batteries of coke ovens, 70 ovens to a battery, and a boiler house, storage tanks, coal chutes and auxiliary equipment. The operation of the coke plant is continuous, 24 hours a day, 7 days a week. Oven temperatures from 1800° to 2200° F. or more are required to produce coke. During full production approximately 375 employees in all classifications work at the Joliet Plant in the manufacture of coke and coal chemicals.

A battery of coke ovens of the size operated at the Joliet Plant contains approximately 3,000,000 silica bricks and has about 18,000,000 joints. Silica bricks are very sensitive to temperature changes under 1150° F. They are designed to be gas tight, but after being heated, if allowed to get cold will not be gas tight again. Any cooling down of coke ovens causes damage, and uncontrolled cooling is certain to cause great damage to the ovens, accompanied by danger and loss from explosion and fire. The danger resulting from the cooling of ovens was known to Superintendent Jones, who had been in the employ of the Joliet Coke Works prior to and during the steel strike of 1919. During that strike the production employees of the Joliet Coke Works walked out and the ovens were permitted to become cold. The resulting damage was so great that the ovens had to be rebuilt at a cost of $2,000,000, and the rebuilding took three years. At the time of the hearing herein before the trial examiner, the estimated cost of rebuilding, such as was done after the 1919 strike, was $9,000,000.

Superintendent Jones and other company officials well remembered the fires and explosions that occurred during the reheating of batteries after the 1919 strike, and upon other occasions. They realized the serious danger of fires and explosions during the period of the 1946 strike, as 82,373 gallons of benzol, 18,532 gallons of toluol, 7,144 gallons of xylol, 5,251 gallons of crude solvent naptha, and 1,189 gallons of naphthalene, all of which was explosive and highly combustible, were stored at the plant on January 20, 1946.

The United States Steel Workers of America, CIO (hereinafter called the union) began a strike against petitioner on January 20, 1946. The union was agreeable that the company maintain the coke ovens at the Joliet Plant during the strike period, but only on condition that every employee working in the plant during the strike was a member of the union. Some 22 production and maintenance employees at the Joliet Plant were not at that time members of the union. The company claimed that to grant the union demand that it employ only union employees to maintain the ovens would be to discriminate against its non-union employees contrary to the employment contract, and it refused to accede to the demand. The contract with the union did not include a closed shop or union shop provision.

When coke is not being produced, coke ovens are maintained at "idle hot," a temperature of approximately 1600° F. Natural gas was not available in January, 1946, at the Joliet Plant to keep the ovens heated, and therefore the company concluded that during the strike period it would operate one battery of coke ovens at "normal operating temperatures" (1800° to 2000° F.) for the purpose of supplying coke oven gas to maintain the other 3 batteries at idle hot (1600° F.) temperature.

Anticipating mass picketing at the gates, the company requested its 47 supervisors,[3] none of whom belonged to the union, to live at the plant during the strike, and most of them agreed to do so. All of them reported at the plant on Sunday, January 20. On January 23, 1946, by midnight, 22 supervisors left the plant, refusing for the remainder of the strike to perform the tasks assigned to them for the heating of

2. Prior to December 30, 1950, petitioner operated the Gary and Joliet Plants as Carnegie-Illinois Steel Corporation.

3. Throughout the Board's decision the supervisory group is referred to as foremen; however, the decision held they were supervisors within the meaning of the original Act and the amended Act.

the battery of ovens during the strike emergency, and on January 24, all of the 27 plant protection employees, who also were not members of the union, walked out of the plant, likewise refusing to perform their usual assignments for the duration of the strike. However, 25 supervisors did remain in the plant for the duration of the strike and performed duties assigned to them, maintaining the ovens at safe temperatures and protecting company property in other ways.

On March 18, 1946, each of the 27 plant protection employees and 20 of the 22 supervisors who had walked off their jobs, and whom the company had subsequently suspended, received a letter of discharge from the superintendent of the Joliet Plant informing them that their pension rights would be preserved and their continuous service record unaffected provided they were rehired by any subsidiary of the United States Steel Company within six months.

The Board filed a complaint on February 8, 1950, alleging unfair labor practices by the company during February and March, 1946, with respect to the suspension and discharge of the 22 supervisors and 27 plant protection employees at the Joliet Plant.[4] The trial examiner issued his intermediate report on October 24, 1950, recommending that the complaint be dismissed. The examiner considered that the Board's decision in Carnegie-Illinois Steel Corp. (Gary Steel Works), 84 N.L.R.B. 851 (hereinafter called the Gary case), affirmed by this court, Albrecht v. N. L. R. B., 7 Cir., 181 F. F.2d 652, was applicable, and held that the supervisors and guards were not unlawfully suspended and discharged and that the company had not engaged in unfair labor practices within the meaning of the Act.

About 9 months later, on July 31, 1951, the Board issued its decision and order herein, holding that the suspension and discharge of the supervisors and plant protection employees designated in the complaint was in violation of sec. 8(1) and (3) of the Act. The Board ordered petitioner to cease and desist from discouraging concerted activities or membership in any labor organization of its employees, and from interfering with its employees in the right of self-organization or in engaging in concerted activities for the purpose of collective bargaining or other mutual aid or protection. It ordered petitioner to reinstate with full back pay 22 supervisors and 23 plant protection employees.

Referring to the findings and report of the trial examiner the Board said: "Because of the extent of our disagreement with the findings, conclusions, and recommended order of the Trial Examiner, we make our own findings, conclusions, and order, * * *." The Board also stated: "Such testimony or other evidence as is in conflict with our findings, and is not specifically discussed hereinafter, is not credited."

The Board recognized how very similar the situation was at the Joliet and Gary Coke Plants during January and February, 1946, saying: "Precisely stated, then, the issue before us is whether the conduct of the foremen (and the guards) in the instant case was so like that of the foremen in the Gary case as to require us to find that by such conduct they forfeited the protection of the Act." The Board then pointed out some differences in the strike situation at each plant, which it apparently considered as justifying a ruling in the Joliet case opposite to its ruling in the Gary case.

A comparison of the similarities and differences in the strike situation at the company's coke plants at Joliet and at Gary in January and February, 1946, therefore seems desirable. Operations at the Gary Plant were on a larger scale than at Joliet, since the Gary Coke Plant included 15 batteries having 1055 ovens constructed of the same type of silica brick as the Joliet ovens. The gas supply for the city of Gary was produced at the Gary Plant. During the strike at Gary, the duration of which was the same period as the strike at Joliet, the company maintained 3 batteries at Gary at normal operating temperatures, and the

4. During the hearing the trial examiner granted a motion by Board counsel to strike four of the guards named in the complaint, leaving a total of 23 guards and 22 supervisors who are covered by the Board's order.

remaining 12 batteries did not produce coke and were kept at idle hot temperature of approximately 1600° F. by the coke oven gas supplied by the 3 batteries operating normally. During the strike period the supervisors at Joliet and Gary worked 12 hour shifts. The same union represented the strikers at both plants. The attitude of the union at Joliet that it would permit only union employees to pass the picket lines was the same as that of the union at Gary. S. M. Jenks was general superintendent and L. F. Burress was division superintendent at both coke plants. The seniority of employees at the Joliet Plant was recognized at the Gary Plant.

Eighty-two supervisors at Gary refused to remain at the plant during the strike and perform duties assigned to them, including the protection of the physical plant. The Board dismissed the complaint brought upon behalf of the discharged supervisors, saying: " * * * we believe that the complainants owed a duty to the respondent, inherent in their position as supervisors, to comply with all reasonable instructions designed to protect respondent's physical plant from imminent damage or destruction." This court specifically approved of the language of the Board in the Albrecht opinion, supra, saying, 181 F.2d at page 658: "In the instant case, in view of the peculiar susceptibility of the Respondent's plant to crippling damage from an abrupt shut-down of its operations, the Respondent was entitled to have in supervisory positions persons on whom it could depend for emergency duty to forestall destruction of key plant facilities, and it was not unlawful for it to discharge those of its supervisors who, by walking out or failing to report during the rank-and-file strike, demonstrated their lack of dependability in an emergency."

■ The fact that great physical damage was shown not to have occurred at the Joliet Plant is unimportant. Lack of great physical damage because of the strike was likewise true at the Gary Plant. In the Albrecht case, supra, this court further quoted with approval the language of the Board, saying, 181 F.2d at page 658: "It is true that in this case insofar as ap-pears from the record, the Respondent was able to avoid damage to its plant, due, presumably to the efforts of those supervisors who remained at work. However, that fact does not, in our opinion, mitigate the seriousness of the breach of discharged supervisors in this case."

■ Although the Board apparently gave little weight to the findings and recommendations of the trial examiner herein, we may not brush them lightly aside. Almost 5 months previous to the decision of the Board in the instant case the Supreme Court handed down its opinion in Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. The court there said, 340 U.S. at pages 493–495, 71 S.Ct. at pages 467, 468: "It is therefore difficult to escape the conclusion that the plain language of the statutes directs a reviewing court to determine the substantiality of evidence on the record including the examiner's report. The conclusion is confirmed by the indications in the legislative history that enhancement of the status and function of the trial examiner was one of the important purposes of the movement for administrative reform. * * * Nothing suggests that reviewing courts should not give to the examiner's report such probative force as it intrinsically commands. * * * Both statutes thus evince a purpose to increase the importance of the role of examiners in the administrative process." The court also said, 340 U.S. at page 496, 71 S.Ct. at page 169: "We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusions. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony."

464

In view of arguments which are repeatedly made before this court on petitions for review of decisions and orders of the Labor Board, it seems advisable to again direct attention to the function of the reviewing court, as set forth by the Supreme Court in the Universal Camera decision, supra, thus, 340 U.S. at page 490, 71 S.Ct. at page 466: "We conclude, therefore, that the Administrative Procedure Act [5 U.S.CA. § 1001 et seq.] and the Taft-Hartley Act direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." In the same opinion the court stated, p. 488, 71 S.Ct. at page 465: "Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including·the body of evidence opposed to the Board's view."

Both in the Gary case and here the Board held that the company could reasonably refuse a union proposal that only union rank and file men be employed (along with supervisors) to safeguard the plant during the strike. However, the Board determined the attitude of the company at Joliet was unreasonable because it would not accede to the demand of the supervisors that the company start to cool down the batteries of the Joliet Plant within 72 hours from the time the strike started.

## Supervisory Employees

On Sunday, January 20, after the 47 supervisors reported at the plant, one of them asked Superintendent Jones if the management planned to have the supervisors stay "to cool the ovens down" and Jones' reply was, "Absolutely not." Later some 20 or more of the supervisors gathered in the basement of one of the factory buildings and discussed the matter of cooling down the batteries during the strike. Three spokesmen were chosen to visit General Foreman Boswell. They waited upon him and asked whether the company intended to obtain natural gas as a substitute for coal during the period of the strike. Boswell replied that he did not think it was possible to obtain natural gas. The three spokesmen thereupon advised Boswell that the supervisors would stay in the plant only for a period of 72 hours unless he could persuade Superintendent Jones to start cooling down the batteries. The supervisors had further discussions with each other. During the period they remained in the plant they performed work normally assigned to rank and file employees. At about midnight on January 23, 17 supervisors walked out, 5 having left a few hours earlier after ascertaining that others would leave at midnight. As before stated·25 supervisors remained and worked in the plant during the strike.

The Board further stated that it was not satisfied that the method of operation for the strike period chosen by the company offered any advantages which justified the hardship it imposed on the supervisors. The Board decision says, "We find, therefore, that the respondent's (petitioner herein) insistence that the foremen maintain the coke batteries at normal operating temperatures for the duration of the strike, rather than cool them down gradually, was not reasonable, under all the circumstances of the case, * * *." The Board concluded that the supervisors had a protected right to take concerted action for their mutual aid and protection which could only be denied them if they had

failed as supervisors to obey reasonable orders in the emergency. Because the Board considered the company's attitude unreasonable, it held that the supervisors did not fail to obey reasonable orders.

The decision of the Board evidences some confusion about the normal operating temperatures of coke ovens. It was impossible to have cooled the four Joliet Plant batteries gradually or under control without the use of outside gas. It was necessary to operate one battery in the normal manner in order to produce the gas needed for the controlled heating of the other three.

Shutting down the operation of a coke plant is of course not a normal operation. It creates dangers and a difficult situation for management to handle, particularly during a strike. The testimony discloses that during previous strikes, supervisors in coke plants of various companies have customarily done the work of production and maintenance employees.

We think the differences in the situation at the Joliet Plant and that in the Gary Plant during the period of the 1946 strike were not substantial enough to justify contrary rulings. Living conditions within the Joliet Plant during the strike undoubtedly were not as satisfactory as they were at Gary; also the Joliet Plant was not supplying the essential gas needs of a municipality. But the duties of the supervisors were similar and the need for protecting the ovens and other plant property from damage or destruction was equally important at both plants. A minority of the supervisors at both plants walked out on their responsibilities.[5] The Board in the Gary case held that the company was justified in discharging those supervisors who walked out. We think the Board was clearly in error in not reaching the same conclusion in the instant case. We disagree with the Board's conclusion that the attitude of the officials of the company was unreasonable because they did not bow to the 72 hour ultimatum of a minority of the supervisors.

We fully agree with the finding of the trial examiner: " * * * the undersigned believes and finds that the selection of the means by which heat should be maintained in the batteries, whether by use of natural gas, butane,[6] or by keeping one battery at normal operating temperature in order to keep the other three batteries hot, or by any other reasonable means, including the replacement of the strikers by new employees, was within the discretion of management." The record as a whole substantiates the finding of the trial examiner, viz.: "The danger to respondent's plant revealed by this record does not seem to the undersigned to differ substantially in kind from that which the Board found threatened respondent's coke ovens as well as its other equipment at respondent's plant at Gary, brought about by the 1946 strike. While it is true that in the Gary case the Board's decision rested, to some extent, upon the fact that respondent was under the obligation of maintaining essential services to the city of Gary, and that this element is not present here, the undersigned does not believe that that was the controlling reason for the Board's decision in that case. The nature and degree of the threat to the physical plant is the decisive factor in that case as well as this."

In N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, at page 45, 57 S.Ct. 615, at page 628, 81 L.Ed. 893, the court said: " * * * The act does not interfere with the normal exercise of the right of the em-

5. The Superior Court of Cook County, in the case of Carnegie-Illinois Steel Corp. v. Frank Annunzio, 48 S. 157, Jan. 29, 1951, in a suit involving the claims of discharged supervisors of the Joliet Coke Plant for unemployment benefits under the law of Illinois, concluded that "such claimants were discharged for misconduct connected with their work." This court in, Keserich v. Carnegie-Illinois Steel Corp., 7 Cir., 163 F.2d 889, 891 (Judge Minton), held: "The conduct of the pe-

titioner in the instant case gave the respondent a legal cause for his discharge if one were needed."

6. The evidence disclosed that natural gas first became available at the Joliet Plant on February 22, four days after the end of the strike. Butane gas was available during the strike in very limited quantities. However, in the entire coke oven history there was no instance prior to February 10, 1946, of the use of butane for coke oven heating.

ployer to select its employees or to discharge them. The employer may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and, on the other hand, the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion." It follows that the petition herein to set aside and vacate the order of the Board, in so far as it applies to supervisory employees, must be granted, and the motion of the Board for enforcement of the order will in that respect be denied.

### Plant Protection Employees

As in the case of the supervisors, the guards were not engaged in organizational activities during the period of the strike. The company asked them to perform their usual work duties during the strike, except that they were required to work 12-hour instead of 8-hour shifts.[7] Because of the possibility of picket line disturbances or violence they were required to live at the plant. Among their important duties were patrolling the plant, preventing theft and fighting, watching for fires, and manning the fire-fighting equipment when and if necessary, each guard having been especially trained in fire-fighting. Each guard was sworn as a deputy sheriff of Will County, Illinois.

After the 22 supervisors left the plant the company arranged for 25 supervisory personnel from the Gary Plant to be brought to the Joliet Plant to take their place. These 25 men were industrial engineers, operating firemen, and maintenance foremen and superintendents, and came to the plant in charge of Division Superintendent Burress. The Gary supervisors arrived at about 4:00 a. m., escorted by State police, and ingress was by an entrance not customarily used, and known as the towpath entrance. The guards had heard rumors that strikebreakers might be brought in, although Superintendent Nicholaesen

had assured them contrariwise. In discussing the matter among themselves some guards expressed the view that they were on duty to protect the property of the company but not to protect strikebreakers. The arrival of the replacement supervisors aroused much excitement among the guards, and one or more set up the cry, "Let's get out of here. The State cops brought in a bunch of scabs." Division Superintendent Burress addressed the guards and asked them not to leave. The guards consulted with the leader of the strikers, one Spiezio, who advised them to leave the plant. Division Superintendent Burress testified that he had explained to Mr. Spiezio that the men with him were not strikebreakers, but supervisors from the Gary Plant, and that the company was not trying to break the strike. However, some of the guards testified that they did not know that the men brought in from Gary were supervisory personnel. On January 24, shortly after the arrival of the Gary supervisors, the guards left the plant in a group, and did not return. At about 7:00 a. m. the 25 Gary supervisors also left the Joliet Plant and likewise did not return.

The trial examiner found that the guards walked out because of "sympathy for the rank and file strikers, dissatisfaction with living conditions in the plant, and disinclination, for family or personal reasons, to stay in the plant 24 hours a day," and determined that if they were engaged in a concerted activity, it was not protected by the Act.

But the Board found that when the guards walked out they acted reasonably, and engaged in a concerted activity protected under the Act. Accordingly the Board found that by their discharge the company was guilty of an unfair labor practice within the meaning of the Act, and it ordered their reinstatement with full back pay.

The record proves that the company did not attempt during the strike period to operate its by-product department, or otherwise than attempt to produce sufficient gas

---

**7.** Company rules provide that guards are subject to 24-hour call for emergency duty, and are subject to suspension or dismissal by the Superintendent for absence without leave or leaving their posts without proper relief.

from one battery to keep the ovens of the other batteries at "idle hot." The concern of the company was plant protection, not production. The record as a whole supports the finding of the trial examiner that one of the reasons the guards walked out was their sympathy for the rank and file strikers. They finally decided to leave the plant, after conferring with strike leader Spiezio. The record also reveals why the trial examiner was incredulous at the testimony of the guards who professed that they had not recognized Division Superintendent Burress, who addressed them, and that they did not know that the 25 Gary men were supervisory personnel. The examiner found: "The undersigned is unable to believe that the Joliet guards remained very long in ignorance. It is hardly conceivable that during the conversation between some of the guards and Jones (Plant Superintendent), DeToffol (Assistant Superintendent, Industrial Relations), and Nicholaesen (Superintendent of Plant Protection), their identity did not become known." We have heretofore held that a walk-out based upon rumor is not sufficient excuse for employees to quit their work. N. L. R. B. v. Reynolds International Pen Co., 7 Cir., 162 F.2d 680, 684. In N. L. R. B. v. Jamestown Veneer & Plywood Corp., 2 Cir., 194 F.2d 192, where four employees quit work because they were dissatisfied with the length of a layoff notice, it was held that their leaving was not a protected concerted activity.

■ We realize that the Board, upon reading the cold record, did not agree with the trial examiner's findings to the effect that the plant protection employees must have known or been informed who the 25 Gary supervisors were, but it was the examiner who had the opportunity to hear and see the witnesses. In a similar situation in the case of Ohio Associated Tel. Co. v. N. L. R. B., 6 Cir., 192 F.2d 664, 668, the court said: "In view of the fact that the examiner heard and saw the witnesses, and the Board did not, it is pertinent to inquire into the relative weight to be given by a reviewing Court to the findings of examiner and Board. * * * It would seem, therefore, that in giving consideration to the whole record, as now we are obliged to do, we may not disregard the superior advantages of the examiner who heard and saw the witnesses for determining their credibility, and so for ascertaining the truth."

■ The plant protection employees, testifying at the hearing, admitted they knew the hazards of fire and explosion when they abandoned their work of protecting the plant in the early morning hours of January 24, 1946. We conclude from the record as a whole that the plant protection employees were discharged for cause, for willfully abandoning in time of great emergency the duties which they were hired to perform, and that in walking out they were not engaged in concerted activities protected by the Act.

■ When the discharged supervisors and guards later asked for reinstatement, each was interviewed by officials of the company, and among questions asked was whether under similar circumstances he would take the same action again. The Board, with Chairman Herzog dissenting, held that this interrogation was a violation of Sec. 8(1) of the Act. We disagree. If, as we have held, the discharges of the supervisors and the guards were for cause, the interrogation as to possible like conduct in the future was not in violation of the Act.

The petition to review and set aside the order of the Board is granted; the Board's request for enforcement of its order will be denied. It is so ordered.