**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**SEBASTOPOL APPLE GROWERS UNION, Respondent.**

**No. 16117.**

United States Court of Appeals
Ninth Circuit.

Aug. 19, 1959.

Jerome D. Fenton, Gen. Counsel, Thomas J. McDermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, Atty., N.L.R.B., Washington, D. C., for petitioner.

Severson, Davis & Larson, George Brunn, Nathan R. Berke, San Francisco, Cal., for respondent.

Before HAMLEY, HAMLIN and JERTBERG, Circuit Judges.

HAMLIN, Circuit Judge.

The National Labor Relations Board has petitioned this Court for enforcement of its order against the Sebastopol Apple Growers Union, hereinafter called respondent, pursuant to Section 10(c) of the National Labor Relations Act, as amended (29 U.S.C.A. § 151 et seq.), herein called the Act.

Respondent, a California cooperative corporation, was engaged in packing, canning and shipping apples and apple products at its plant near Sebastopol, California, and made substantial interstate purchases and sales. The jurisdiction of the National Labor Relations Board and of this Court is not contested.

The facts show that respondent operated a seasonal canning business, the season generally lasting from around the middle to the latter part of the year. Up to the year 1954 the plant was not unionized. In 1954, canning operations began on July 15. About July 28, 1954, the president and business manager of the General Truck Drivers, Warehousemen and Helpers Union, Local No. 980, AFL (hereinafter called the union) called on the general manager of respondent to discuss the organizing of the plant by the union. Activities then commenced by management and employees which culminated in the proceeding before the NLRB.

On August 17, the union filed a petition with the Board requesting an election among respondent's employees. A representation hearing was held on September 19, and on October 4 the Board issued an order that an election be held. The order of October 4 did not set the date for the election, which was subsequently scheduled and held October 19.

Much testimony was produced by each side, the hearings commencing on July 19, 1955, and concluding on October 17, 1955. On March 7, 1956, the Trial Examiner made findings, conclusions and recommendations which were transmitted to and subsequently adopted by the Board.

Respondent preliminarily contends that the Board arbitrarily refused to give effect to a settlement which had been agreed upon by the union and the respondent. On March 9, 1956, the union filed a motion to reopen the record for the purpose of permitting it to withdraw the charge, or in the alternative, to permit it to move to dismiss the complaint, or in the further alternative, to permit it to withdraw the charge without reopening the record. The motion set forth that the union and the respond-

ent since the hearing had been closed had reached an agreement whereby the respondent recognized the union as the collective bargaining agent. The motion further set forth that the union and the respondent had agreed that the alleged discriminatees would be placed upon a preferential hiring list, and the union agreed to obtain waivers from all of the alleged discriminatees with respect to any claims for possible back pay. The motion of the union contained the following language:

"* * * that there is a serious question as to whether any of the alleged discriminatees are, in fact, entitled to back pay, and if so the amounts to which they may be individually entitled are so small as not to warrant further expenditure of time and money for the purpose of determining the amounts, if any, to which they might be entitled."

The motion further alleged as follows:

"6. That the foregoing agreement and arrangement between the Charging Party and the Respondent will and does effectuate the policies of the Act which has as its underlying purpose the stabilization of labor relations and that such arrangements, agreements, procedures and methods of resolving the dispute and the alleged unfair labor practices are compatible with any possible remedy which the Board might possibly order.

"7. That no good purpose would be served and the national policy, as set forth by Congress in the Act, will not be fulfilled if this proceeding continues with the attendant consumption of time through further protracted litigation and the possible filing of exceptions."

Without any hearing being had on the motion of the union, the Board on April 11, 1956, made an order as follows:

"It Is Hereby Ordered that the motion be, and it hereby is, denied because it does not appear that it will effectuate the policies of the Act to close the case on the basis outlined in the motion."

Apparently ever since the parties settled their differences in 1956, there has been no labor trouble. It is now 1959, and this proceeding which the parties themselves desired to terminate is still before the courts, solely because the Board refused to accept the settlement made by the parties themselves.

In N.L.R.B. v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 497, 83 L.Ed. 627, the Supreme Court noted that "the purpose of the Act is to promote peaceful settlements of disputes by providing legal remedies for the invasion of employees' rights." Five years later, the Supreme Court in Wallace Corp. v. N.L.R.B., 323 U.S. 248, 65 S.Ct. 238, 241, 89 L.Ed. 216, said:

"To prevent disputes like the one here involved, the Board has from the very beginning encouraged compromises and settlements. The purpose of such attempted settlements has been to end labor disputes, and so far as possible to extinguish all the elements giving rise to them."

Much can be said in favor of the position that the Board acted arbitrarily when, without having a hearing upon the proposed settlement, it summarily denied the motion of the union that a settlement agreed upon by the parties be permitted to end the dispute. However, we prefer not to base our decision upon the ground that the Board acted arbitrarily.

Considerable testimony was introduced to the effect that the management was guilty of unfair labor practices in violation of Section 8(a) (1) by attempting to prevent the plant from being organized. Witnesses testified that persons in management positions said to employees, "If the plant would go union, that he [plant manager Martini] would close it down;" "that he'd closed down his plant in Santa Rosa and he would do the same at Molino if we was to go union;" that the night floor lady said,

"Don't get my girls all excited about the union, because * * * if you do * * * you are going to get blackballed from every job around here;" that the same floor lady told employees that they would be laid off if they did not quit talking about the union, and further said, "If you girls think I am tough now, wait; if the union gets in, I'll show you how tough I can be;" that the same floor lady in the presence of a group of employees said that if any of them talked union or signed pledge cards they would immediately lose their jobs, and that if any of them attended union meetings there would be someone there from the company who would come back with their names, which would get to Martini (plant manager) and that they would lose their jobs.

Without going further into detail, from the extensive record it is clear that there was ample evidence upon the whole record to show violations of Section 8(a) (1) of the Act.

We shall, however, discuss separately one matter which the Trial Examiner found to be a violation of Section 8(a) (1).

■ In the course of the hearing, the General Counsel amended his complaint by adding as an allegation of the violation of Section 8(a) (1) of the Act the adoption by respondent before the commencement of the 1955 season of a new form of application blank for use by applicants for employment. This new form was longer than the one used in 1954 and prior thereto, and called for detailed information about the applicant and his educational and employment history. Included among the questions was the following: "25. To what trade, professional or other organizations are you a member [sic]: (Do not name any organization which would reveal your race, religion, color or ancestral origin.)" At the conclusion of the form the applicant was required to agree to abide by all present and subsequently issued rules of the company, to authorize past employers to furnish all information "they may have concerning" the applicant, to au-

thorize an investigation of all statements in the application, and to "understand" that in the event of his employment he would be subject to dismissal if any of the information given was false or if he had failed to give any material information requested.

The Board found that by the use of such application form the respondent interfered with, restrained and coerced its employees and applicants for employment in the exercise of the rights guaranteed in Section 7 of the Act. The only testimony concerning how this form happened to be used was given by Mr. Martini, the manager of the respondent. He testified that in May, 1955, he mentioned to someone at an industry meeting that he was about out of employment forms, and since the forms that he had used had been so brief he was going to see if he could find a new form that would be a little more complete. He was advised by others that there was a form which was being generally used throughout the industry, and that thereafter this form was sent to him and he adopted it. It was shown that this same form used by the respondent was used by many other canneries in the industry and that there was no discussion by anyone that the form would be used for the purpose of trying to find out whether people belonged to a labor organization or not. Witnesses produced by the Board also testified that they had signed this form in making their application for work in other canneries.

The Board recognized that the use of such an application form, standing by itself, was not the basis for a finding of an unfair labor practice, N.L.R.B. v. Ozark Dam Constructors, 8 Cir., 190 F.2d 222, at page 227, but contends that such a practice may take on a coercive character in a background of hostility to a union.

When this form was used in June, 1955, and at the time of the Board's decision in August, 1957, the complexion of the labor picture at respondent's plant had entirely changed. In 1956 union and respondent had settled their dispute

entirely, and have been bargaining with each other ever since that time.

This Court, in N.L.R.B. v. McCatron, 9 Cir., 1954, 216 F.2d 212, at page 216, said:

"We are of the opinion that in order to violate § 8(a) (1) such interrogation must either contain an express or implied threat or promise, or form part of an over all pattern whose tendency is to restrain or coerce. We so held in Wayside Press, Inc., v. N.L.R.B., 9 Cir., 1953, 206 F.2d 862. Other circuits have taken the same view."

In this case there is no evidence that anyone was "actually interfered with, restrained or coerced," nor do we find in the question any "express or implied threat or promise."

Under the circumstances in question, we hold that the use of the application form was not a violation of Section 8(a) (1).

We now come to a discussion of the claimed violations of Section 8(a) (3). These may be divided into two parts. First, it was found by the Board that three employees—Orice Storey, Gloria Pate and Elsie Dickerson—were discriminatorily discharged on September 25, October 18, and October 25, 1954, respectively.

Concerning Orice Storey, there was testimony that she was known by the management to be a union adherent, that Martini, the plant manager, said she was trying to form a [union] committee on the night shift, that just prior to her being fired she was talking about union matters to other employees, and that after her discharge the plant manager said, "You were a good worker, but I cannot have you talking up this union thing and agitating among the other girls and forming committees."

On the other hand, the respondent contended that she was fired for congregating with other employees in a dangerous place in the plant and that after punching out on the time clock she refused to leave the plant after being ordered to do so. The Trial Examiner believed the evidence favorable to Orice Storey, and found accordingly. We hold there was substantial evidence to support the finding of discrimination.

Gloria Pate was employed by respondent on July 15, 1954, which was the day production started in that year according to the finding of the Trial Examiner. She signed a union pledge card on August 4 and was on the day shift committee for the union. It was early reported to the superintendent of respondent that she was an agitator for the union. There was ample evidence to show that respondent knew that she was an active participant on the union side of the controversy.

In October the respondent decided to operate only one shift, and on October 15, which was a Friday, a list of employees to be retained was read at the plant. Pate and another person testified that they heard Pate's name as one to be retained. On Monday, October 18, Pate reported to the plant, obtained a time card, punched in, and went to her station. About ten minutes after she had started to work, a foreman approached her and asked her what she was doing there. When she told him she was working, he told her she was not supposed to be there, because he had been told that she was not on the list to be working. Pate told the foreman that her name was on the list to report to work, and the foreman said he would check. According to Pate, the foreman returned, told her that he was sorry, that her name *was* on the list but that it was a mistake and she would have to go home. Pate told the foreman that if she punched out and went home, respondent would have to pay her for reporting to work.

The foreman said they would pay her for two hours. Pate then went to the plant manager to complain, and was told that respondent was laying off in accordance with seniority. There was testimony showing that other workers who had less seniority than Pate were rehired and there was no evidence of any

kind that Pate had been an unsatisfactory worker.

The Trial Examiner found that from October 16 to October 19 respondent had in its possession a list of union members and that Pate's name was on this list.

Some of the above testimony was controverted by the respondent, but the Trial Examiner found the above testimony in the main to be true and found that Pate had been discriminatorily discharged. We believe there was substantial evidence to justify the finding of the Trial Examiner and the Board.

Elsie Dickerson was employed by the respondent in the 1954 season on July 19, having worked for respondent in the 1953 season. She signed a union pledge card on August 4, attended union meetings, but was not on the union committee. On October 14, when other union employees wore union buttons, Elsie Dickerson also wore a union button. On October 19, the day of the election, she was advised by the employment manager that she was wanted at the shed where the election was being held, apparently as an observer for the union. She went to the shed and acted in that capacity. On the afternoon of October 25, while Dickerson was working on the trim line, she picked up an apple that had been peeled and cored, using her coring knife to put two bisecting cylindrical holes horizontally through the apple, placed a core in one of the holes protruding about an inch, and placed it back in the flume. She spoke of this as "decorating" an apple. At quitting time that day the floor lady put her arm around Dickerson and said, "I have something to do that I don't like to do, I have to let you go. You were seen making holes in an apple and you put a core in it and put it in the water and it got to the office." Dickerson told the floor lady that she had expected to be discharged because she had been picked as an observer in the election. Dickerson denied that she had fixed more than one apple as above described.

There was testimony showing that on other occasions apples had been "decorated" and that no employees had been discharged for doing it. The superintendent testified that a little horseplay was all right, but that sabotaging the product was not. There was conflicting testimony by three employees offered by the respondent who the Trial Examiner felt did not tell the complete truth. There seemed to be a dispute as to whether Dickerson had ever done this on any prior occasion, but the Trial Examiner found that she had never been warned by the respondent concerning this practice. The result of Dickerson's conduct would not appear to be too serious, because the plant manager made an affidavit in which he said it was "inconceivable" that plugged apples could have got past the inspector.

The Trial Examiner found that Dickerson's playful act would in itself not have prompted the respondent to discharge her, that no other employee had been discharged for such conduct, and that respondent made use of slight cause to discharge Dickerson (for which it would not normally have discharged an employee) because she was a prominent union supporter known to be such by the respondent. As is usual in such matters, the evidence was sharply conflicting, but the Trial Examiner found in favor of the employee and against the respondent. We cannot say that there was not substantial evidence to justify the Board's finding.

The second claimed violation of Section 8(a) (3) is alleged to have occurred on October 15, 1954.

On October 12, 1954, respondent at its board of directors meeting decided to reduce its operations from two shifts to one shift commencing October 18, the following Monday. The selection of employees to be laid off was made by respondent's superintendent, a floor lady, and its night shift foreman, after receiving lists of employees to be retained from other supervisors. On October 14, a notice was prepared, giving notice of a meeting

of employees to be held between the end of the day shift and the beginning of the night shift on October 15. A list of those to be retained in respondent's employ and who were to report for work on the following Monday morning, October 18, was read at this meeting. As a result of the change from two shifts to one shift, there was a reduction of approximately 143 employees.

The Trial Examiner and the Board found that this layoff was discriminatory and that it was a violation of Section 8 (a) (3) and (1).

This Court discussed the governing principles in determining whether discharges are discriminatory in N.L.R.B. v. Kaiser Aluminum & Chemical Corp., 9 Cir., 217 F.2d 366, at page 368:

> "Discrimination relates to the state of mind of the employer. 'The relevance of the motivation of the employer in such discrimination has been consistently recognized * * *.' The General Counsel had the burden of the issue. Substantial evidence must have been adduced (1) to show the employer knew the employee was engaging in a protected activity, (2) to show that the employee was discharged because he had engaged in protected activity, and (3) to show that the discharge had the effect of encouraging or discouraging membership in a labor organization. Although the Board is entitled to draw reasonable inferences from the evidence, it cannot create inferences where there is no substantial evidence upon which these may be based. Unless there is reasonable basis in the record for making of the three essential findings, the employer who is permitted to discharge 'for any other than union activity or agitation for collective bargaining with employees' need not justify or excuse his action."

With these principles in mind, we shall proceed to examine the evidence upon which the Board relied for its discriminatory order.

As testified to by witnesses for the respondent, the reasons for the October 15 layoff were generally: (1) that on October 15 (the time of the change from two shifts to one shift) there was an insufficient supply of apples on hand or in prospect to justify the operation of two shifts (it was shown that in prior years there also had been a reduction from two shifts to one shift toward the latter part of the season) and (2) the growing shortage of storage space in respondent's warehouse.

The Board, in its brief, makes no contention that reason number 1 as set out above was not true, but the Board claims that this was the result of the earlier actions of respondent, commencing September 13, in shipping apples to a cooperative, of which respondent was a member, for processing. The Board found that respondent shipped 1358 tons of apples to this cooperative for processing between September 13 and October 15, that this was done to enable respondent to get rid of union supporters in advance of the election, and found that the diversion of the apples to the cooperative was in pursuance of an illegal object. The Board found also that shipping apples to the cooperative was more costly to respondent, because it had to pay the cooperative $1.58 per case of canned apple sauce plus transportation costs.

There is no evidence in the record to support the Board's finding that this was a more costly way of processing the apples, as there is no evidence of either the cost to respondent of processing apples itself or what it cost to have them processed by the cooperative. Further, there was no evidence of what profit respondent might receive on account of the processing of these apples by reason of its membership in the cooperative.

The respondent introduced substantial evidence showing that there was an increase of approximately 28 per cent in the volume of apples received by it in the 1954 season over that of the 1953 season. About 13,000 tons were received in 1953 and 16,700 tons in 1954. The testimony showed also that the crop in

1954, while larger, was considerably poorer in quality and that because of this condition a greater proportion of the crop had to be canned. Respondent itself absorbed some 2300 tons of the increase of the crop and sent 1358 tons to the cooperative for handling. The evidence showed that during the months of August and September the apples were being received at the cannery in great quantities and faster than they could be processed. They were stored in open boxes three tiers high. The apples started piling up in the latter part of August, and under these conditions—(1) the large volume of apples, (2) the poor quality of the crop which necessitated canning a greater proportion, (3) the diminution of adequate storage space, and (4) the rotting of the apples in the boxes (respondent contends that some 700 tons spoiled)—ways and means of handling the situation were considered at a board meeting of respondent in early September.

Considerable testimony was also introduced, setting out the amount of storage space available in August, September and October, and describing the various types of storage space available. Testimony was also received from respondent's witnesses showing the necessity for handling different types of apples in different ways. As a result of all of the circumstances, it was the judgment of the management that apples should be sent to the cooperative for processing, and this practice was carried on from September 13 to October 15.

█ Although no substantial testimony was offered by General Counsel upon this subject which was contrary to that offered by the respondent, the Trial Examiner was of a different view than the management concerning the urgency of the situation. He stated in his report: "I am not convinced that the need for getting the assistance of the Co-op beginning on September 13 was as pressing as was represented, if at all." And later, he said: "I am not convinced that removal of the apples from storage, not

only on September 13 but for a solid month thereafter until October 15, was dictated by desperate need." The burden was on the General Counsel to establish the unlawfulness of respondent's actions, not upon the respondent to establish its actions were lawful.

The testimony apparently mainly relied upon by the Trial Examiner and the Board to counteract respondent's testimony as to the business reasons for their cannery practices was that of employee Unciano who testified that he asked respondent's superintendent in September why respondent was sending apples to the cooperative. According to Unciano's testimony (which was denied by the superintendent), the superintendent replied that respondent was "trying to finish all the apples as fast as they could, because they were afraid the union was going to get in. * * * "

At the time referred to by Unciano, no date had been set for an election at respondent's plant and, in fact, at that time no election had even been authorized.

Against the background of all the testimony showing business reasons for the action of the company in sending apples to the cooperative for processing, we feel that Unciano's testimony, if true, is not sufficiently clear or unequivocal to be determinative of the issue involved.

Concerning the second reason given by respondent for the October 15 layoff, to-wit, the shortage of storage space, the Trial Examiner argued that if the respondent had handled its apples in a different way there would have been more storage space available. He contended that the rapid filling of the warehouses with canned goods resulting from the utilization of the cooperative's facilities as well as its own should have been foreseen by respondent before October 12. These and similar arguments of the Trial Examiner are not persuasive to us.

█ The Trial Examiner might have operated the cannery differently. But

the respondent had the right to determine for itself how its business was to be conducted. Management may make wise decisions or stupid ones, and it is no concern of the Board unless they are unlawfully motivated. Apparently the Trial Examiner in this case fell into the same error as was discussed in N.L.R.B. v. McGahey, 5 Cir., 1956, 233 F.2d 406, 412, where the Court said:

"The Board's error is the frequent one in which the existence of the reasons stated by the employer as the basis for the discharge is evaluated in terms of its reasonableness. If the discharge was excessively harsh, if the lesser forms of discipline would have been adequate, if the discharged employee was more, or just as, capable as the one left to do the job, or the like then, the argument runs, the employer must not actually have been motivated by managerial considerations, and (here a full 180 degree swing is made) the stated reason thus dissipated as pretense, nought remains but antiunion purpose as the explanation. But as we have so often said: management is for management. Neither Board nor Court can second-guess it or give it gentle guidance by over-the-shoulder supervision. Management can discharge for good cause, or bad cause, or no cause at all. It has, as the master of its own business affairs, complete freedom with but one specific, definite qualification: it may not discharge when the real motivating purpose is to do that which Section 8(a) (3) forbids. N.L.R.B. v. Nabors, supra [5 Cir., 196 F.2d 272]; N.L.R.B. v. National Paper Co., supra [5 Cir., 216 F.2d 859]; N.L.R.B. v. Blue Bell, Inc., supra [5 Cir., 219 F.2d 796]; N.L.R.B. v. C. & J. Camp, Inc., supra [5 Cir., 216 F.2d 113]."

In N.L.R.B. v. Wagner Iron Works, 7 Cir., 1955, 220 F.2d 126, 133, the Court said:

"Obviously, the Act does not interfere with the employer's right to conduct his business, and, in doing so, to select and discharge his employees. It proscribes the exercise of the right to hire and fire only when it is employed as a discriminatory device. N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893; United States Steel Co. v. N.L.R.B., 7 Cir., 196 F.2d 459, 465–466."

The scope of review of this Court in a case of this type was discussed in Universal Camera Corp. v. N.L.R.B., 340 U. S. 474, 71 S.Ct. 456, 464, 95 L.Ed. 456, 464. The Court there said that the Taft-Hartley Act "definitely precludes" courts from determining "the substantiality of evidence supporting a Labor Board decision merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence from which conflicting inferences could be drawn."

The Board further held that the October 15 layoff was discriminatory because there were more union than non-union members laid off at that time. There was no substantial evidence on the whole record that at the time the list of persons to be retained was made up on October 14, respondent knew that more than eight or nine of its 253 employees were union sympathizers. And, of course, as we held in Kaiser Aluminum & Chemical Corp., supra, substantial evidence of knowledge of union sympathy is the first prerequisite of a finding of discriminatory discharge. The Trial Examiner found that a list of union members was not obtained by respondent until October 16, which was the day after the layoff occurred. The evidence of respondent showed that the retained list was made up upon recommendation of supervisors, a foreman, a floor lady, and the superintendent, and that in determining the employees to be retained, seniority and ability were taken into consideration.

In the absence of evidence showing that respondent knew who were union

714

sympathizers and who were not, it is not surprising that the percentage of persons laid off did not agree exactly with the percentage of union sympathizers.

▇ As indicated above in Kaiser Aluminum & Chemical Corp., supra, the burden was upon the General Counsel to show (1) that the employer knew the employee was engaged in a protected activity, (2) that the employee was discharged because he had engaged in protected activity, and (3) to show that the discharge had the effect of encouraging or discouraging membership in a labor organization.

▇ It was normal practice for respondent to reduce from two shifts to one some time prior to the end of the season. The following language used by the Court in N.L.R.B. v. McGahey, supra, is appropriate:

"Rotation in personnel is a common thing. The employer does not enter the fray with the burden of explanation. With discharge of employees a normal, lawful legitimate exercise of the prerogative of free management in a free society, the fact of discharge creates no presumption, nor does it furnish the inference that an illegal—not a proper—motive was its cause. An unlawful purpose is not lightly to be inferred. In the choice between lawful and unlawful motives, the record taken as a whole must present a substantial basis of believable evidence pointing toward the unlawful one."

We hold that upon the whole record there was not substantial evidence to show that General Counsel had borne its burden of establishing that in 1954 the October 15 layoff was in violation of the Act.

The petition for enforcement of the Board's order is denied as to the use of the questioned application form and as to the mass layoff of October 15, 1954.

Enforcement of the balance of the Board's order is granted.