**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**REDWING CARRIERS, INC., Respondent.**

**No. 18257.**

United States Court of Appeals Fifth Circuit.

Dec. 6, 1960.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Herman M. Levy, Atty., Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Melvin Pollack, Atty., National Labor Relations Board, Washington, D. C., for petitioner.

Alexander E. Wilson, Jr., Robert T. Thompson, Wilson, Branch & Barwick, Richard N. Hubert, Atlanta, Ga., for respondent.

Before RIVES, Chief Judge, and TUTTLE and WISDOM, Circuit Judges.

TUTTLE, Circuit Judge.

This is a petition for enforcement of an order of the Labor Board based on alleged violations of Sections 8(a) (1) and 8(a) (3) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (1, 3).

The respondent is a large motor carrier, using some 200 trucks and tractor-trailers in the hauling of asphalt and petroleum supplies. Its equipment was heavy and expensive, the vehicles costing from $16,800 to $22,000 per unit. The products being carried in some cases are heated (350° temperature in the case of asphalt), and in the case of other petroleum products they were highly inflammable. All drivers were employed initially on a probationary status for a six-month period.

In July 1958 an effort was made to arouse interest in the Teamsters Union among the respondent's drivers. There is no evidence that this came to the attention of the company until July 19th when credible evidence is to the effect that Ray Cunningham, respondent's head dispatcher, saw several of the drivers sitting in an automobile at a drive-in restaurant drinking with union president Hughes, whom he knew. Although disputed by Cunningham, testimony that the Board credited charged him with saying to a driver named Wilson who was sitting with him in the restaurant: "If you see any more drivers come this way, you tell them to stay away or some innocent party may be fired on account of this meeting." Wilson then went out to the Hughes' automobile. Cunningham then stopped by the automobile, spoke to Hughes and was able to observe four drivers, Spurlock, Hults, Gurnsey and Sigrist, as well as Wilson, sitting in the car with Hughes.

Spurlock had been active in signing up union members, although there was no evidence that Cunningham knew of this activity. No one else in respondent's management knew of the union effort until August. Hults and Wilson had also signed union cards.

Some days prior to July 19th Spurlock had been arrested and charged with leaving his truck unattended on the highway and his trial was set for July 23rd. On July 22nd Spurlock's truck was on an asphalt delivery job and became bogged down. It was pushed from behind by a bull-dozer with a blade which bent the rear end and slashed a rear tire. Spurlock made no written report of this incident, but mentioned to it Klein, the night dispatcher who was found by the examiner not to be a supervisor.

The next day, July 23rd, Spurlock was fined $30 for the previous charge of traffic violation and on July 24th, the first day he reported for work after the pushing incident, he was fired by Cunningham "because I was pushed."[1] At the

---

[1]. Cunningham's testimony, which was undisputed, was:

"A. Tuesday afternoon the shop informed me that Spurlock had done some damage to his trailer, to some tires. He had let something push his truck in.

"Q. What action did you take? A. So that night then I told the dispatcher not to let Spurlock go out again until he seen me.

"Q. That was Tuesday night, is that correct? A. That was Tuesday night.

"Q. Did he work on Wednesday? A. No, sir.

"Q. Why not? Do you know? A. He was in court.

"Q. Why, do you know? A. On a previous accident.

"Q. Do you know whether any action

time of this occurrence and for some years previously the respondent had in its written rules, on which all new employees were given a written test, the following instruction to drivers:

"Under no circumstances are you to allow a bull-dozer or other vehicle to push your truck. You may be pulled, but by the tow hooks only, not by the bumper."

Spurlock testified he knew of this rule, and he also testified that he knew of the following written rule:

"Drivers are subject to dismissal for violating any of the foregoing rules and regulations."[2]

Other rules in effect were:

"*New Drivers*. All drivers are hired on a trial or probationary basis for a 6 months period."

And,

"Any driver who becomes involved in a preventible accident, is subject to immediate dismissal, especially if he is a new driver."

Spurlock made no effort to explain or condone his conduct on the occasion of reporting to Klein that his truck was damaged, but at the hearing before the examiner he testified that he had been forced to let the truck be pushed by the superintendent of the construction job at the job site. When Cunningham ordered him fired for violating the rule he knew of no such excuse and his action must be viewed, therefore, on the facts as he understood them. While, if he had known the true facts, it might be argued that he would not, without some other motive, have fired Spurlock, the motivation of his action must be viewed as he knew the facts and that was that he learned the day after Spurlock, a probationary driver, had been fined $30 for a traffic violation, he had damaged his truck in the violation of a positive rule adopted for a reasonable and important purpose.[3]

The general counsel sought to show on the hearing before the examiner that this action by Cunningham in firing Spurlock was not the real motive, but that Spurlock was fired because of his union activity. In an effort to support this thesis, witnesses were questioned about the extent to which the no-pushing rule was enforced. Several other drivers were called who testified that either in the yard or on the road they had caused or seen equipment pushed. They testified that they had not been fired or otherwise disciplined on account of such acts. The significant thing about all of these instances, however, completely ignored by

---

was taken on that or not? A. Yes, sir; he was fired."

And, again he testified:

"Q. What happened at that time? A. Thursday morning he was discharged.

"Q. Who discharged him? A. Mr. Roach.

"Q. On whose orders? A. Under my orders.

"Q. Why did you discharge Spurlock? A. For his accident, and for the damage he did to the equipment from violating the company rule, letting a bull-dozer push his equipment.

"Q. How long had he been working for you? A. About five months."

2. In fact he admitted that in a written question on examination filled out and signed by him at the time he was taken on as a probationary employee, he filled in the blank space in response to the question: "What is the penalty if a driver violates a company rule?" by inserting the word, "Dismissal" in his own hand.

3. The company's president stated why the rule against pushing had been adopted:

"Q. There has been some discussion concerning the rule on pushing equipment with bulldozers. When was that rule put into effect? A. Oh, at least ten years ago.

"Q. What was the reason for that, Mr. Mendez? A. Because our equipment is not designed to be pushed in the back.

"Q. Why? A. Because the bumpers are made out of the same gauge metal as the tanks on 90 per cent of the equipment; they are just 12 gauge metal; and all our tanks are frameless tanks, they don't have a frame that holds the tank together, which is all built within the tank, and they just can't stand any pushing. You just tear them all to pieces if you push them; that is why we don't permit them to be pushed."

the Board, is that in not a single case testified to as having been known to respondent does it appear that the pushing occurred without express prior permission from Cunningham or someone else in a position to grant permission in a particular emergency. Of course, if the respondent, to meet an emergency, authorized a driver to extricate his vehicle in a way contrary to general instructions, this did not authorize a driver to violate instructions on his own responsibility. There was thus no evidence before the examiner that would permit an inference that the strict enforcement of the no-pushing rule, when damage resulted, in the case of a probationary driver, acting without asking for permission to deviate from the rule, was harsh or unusual. Especially is this true when the appraisal of the violation is made immediately following another traffic violation which resulted in payment of a fine, and since the time within which the driver would pass from a probationer to a regular employee was about to expire.[4] Moreover, with drivers graded as A, B and C as to overall qualities, Spurlock was a C grade driver when the rule violation occurred.

We think it clear that but for the fact that Spurlock was an active union man no one would say that the company's action in discharging him under the circumstances then known to Cunningham was unreasonable or overly harsh. There is, therefore, only the matter of Spurlock's protected activities that can be cited as supporting the Board's conclusion that this employee was fired from an illegal motive.

Here, there is no evidence that respondent knew anything about union activity or Spurlock's connection with it until July 19th, and there is no evidence that even then respondent knew that Spurlock was a member, much less that he was active in signing up others. On this point, the examiner made the following finding:

"Whether or not company knowledge of his extensive union activities (mostly at or near his home, as we have seen) could properly be inferred under such circumstances because the plant is small,[4] there is direct evidence that the Company knew of Spurlock's association with the union president, Hughes, whom Cunningham described as its business agent." (Footnote not reproduced.)

Thus, the examiner, while implying that possibly he could do so, did not base his finding of respondent's knowledge of Spurlock's union activity on the fact that this was a small company.[5] He based it solely on what occurred at Mary Ann's drive-in on July 19th. All that occurred there was that Cunningham sent Wilson, a driver, out to tell any other drivers that they should "stay away, or some innocent party may be fired on account of this meeting." He then saw Wilson, Spurlock and three other drivers sitting in Hughes' car.

Of those thus seen in the Hughes car, Spurlock was fired on July 24th, as already discussed. Wilson was fired on July 30th, for failing to call in to report absent, and Hults was fired on August 21st because of knocking over a fire plug. The record is silent as to what, if anything, happened to Sigrist and Gurnsey, who were also seen in the Hughes car.

On July 29th, several days after Spurlock had been fired, Cunningham was again at the Mary Ann drive-in taking a drink in his car. On this occasion he parked behind the car of a driver named Farrow, whose wife testified that Cunningham signalled for her to come back

---

4. The president of the company testified that it took a full six months period to enable the management personnel to determine whether a new driver was one who possessed all the qualifications of reliability and skill needed to operate respondent's equipment. Spurlock's pro-bationary period would expire 11 days after his discharge.

5. We know of no case in which a court has permitted such an inference. Neither the board nor the general counsel attempts to justify such a theory.

to his car, at which time the following transpired:

"Q. What was the conversation about the union? A. Well, we were talking, and it come up. I asked him what he thought about the union out there at Redwing, and he just sort of laughed at me and he said, 'Well, it will never go through,' and he said, there is one thing that he more or less warned me in a friendly way—

\* \* \* \* \*

"Trial Examiner: All right. He laughed, and what did he say?

"The Witness: He laughed, and told me 'It will never go through.' And then he told me that my husband, the company that we were with that night more or less, wasn't—it would be putting his job in jeopardy, you know, jeopardizing his job; in fact, if he didn't stop messing around there at Mary Ann's Drive-in and having anything to do with the ones that were trying to get the union in, that it would more or less—well, it wouldn't be too good for him. In other words, having you know, meeting there, talking to them or anything like that, it would more or less jeopardize his job; in fact, it wasn't too good to be seen there at Mary Ann's Drive-in in their company.

\* \* \* \* \*

"Q. Did you ever tell your husband about this? A. Yes, I told him.

"Q. When? A. When I went back to the car."

Farrow was fired on August 1st because he complained of a three day suspension for reporting in late on account of having a flat tire, and the company's refusal to let him turn it into a five day vacation.

Spurlock, Wilson, Hults and Farrow all filed complaints of discriminatory firing. The examiner found against all but Spurlock. In each of the cases the examiner considered at considerable length the question whether the dereliction for which the firing occurred had been waived or whether it was "pretextuous," based on the company's course of action. As to Hults and Wilson, whose identification with the union was exactly the same as Spurlock's, so far as the company's knowledge was concerned, the examiner held that the mere presence of these two men at Hughes' "meeting" was insufficient to permit an inference that their subsequent dismissals were motivated by anti-union animus.[6] As to Farrow, although the threat credited by the Board was made to him almost directly, and although he too had signed a card, the examiner said:

"Beyond this incident [the threat to Mr. Farrow] there is no testimony which even remotely indicates that Farrow engaged in union activities *or that the company had knowledge or belief of such activity on his part.*" (Emphasis added.)

Thus, it appears that as to three employees who were union members, and were identified as having an association with the Teamsters Union, the examiner found lack of sufficient evidence of activity and of knowledge by the company, or both, to warrant the inference of discriminatory firing. But as to Spurlock whose identification with the union so far as the company was concerned, was

6. As to Wilson, the examiner said:
"Here the activity was apparently limited to signing a union card, and *there was no basis for inferring that the Company had knowledge of this limited activity* by Wilson." (Emphasis added.)
As to Hults, the examiner said:
"In any event, on the issue of discriminatory intent with which we are here concerned, we have no evidence of un-ion activity by Hults *or company impression* of such activity after his appearance in Hughes' automobile on July 19 \* \* \* (I have consistently emphasized and relied on the presence of employees in Hughes' automobile as witnessed by Cunningham. *The finding of discrimination against Spurlock is based on this.* But Hults was not discriminated against for that reason \* \* \*)" (Emphasis added.)

his mere presence in Hughes' automobile, the examiner and the Board found that a proper inference of discriminatory firing could be made.

It is patent that such a distinction must rest on one of two equally untenable theses. Either the actual activities of Spurlock in signing up others, *although not known by the company,* tipped the scales, or the absence of a valid non-discriminatory ground of discharge distinguished his case from the others.

■ This Court, in common with the Courts of Appeals of other circuits, has frequently been faced with the necessity of determining whether a finding by the Labor Board that an employer is guilty of discriminatory firing, is supportable under the recognized legal standards, i. e., substantial evidence on the record taken as a whole. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. Many such cases present difficult problems for the court to decide whether the motivating cause of discharge is the one assigned by the company or is a desire to get rid of an employee active in union affairs or other protected activity. The guides to decision in such cases are to be found in the prior decisions of this Court. The opposition of an employer to union organization and even unlawful interference are not enough without more to make the discharge of an employee wrongful. N. L. R. B. v. Hudson Pulp & Paper Corp., 5 Cir., 273 F.2d 660; N. L. R. B v. McGahey, 5 Cir., 233 F.2d 406. On the other hand, if the motivating cause of a discharge is the union activity of the discharged employee, then the discharge is, of course, unlawful. In a case in which ample grounds for discharge appear and a strong showing of union activity by the employee known to the employer is also shown, the problem thus posed is a difficult one to resolve. We have dealt with such situations in N. L. R. B. v. McGahey, supra; N. L. R. B. v. Fox Mfg. Co., 5 Cir., 238 F.2d 211, 215; N. L. R. B. v. Coats & Clark, Inc., 5 Cir., 231 F.2d 567.

■ We think we do not here have such a difficult problem in light of the view we take of the undisputed evidence. The Board's entire predicate for contending that the union activity of Spurlock was the motive for his discharge was its conclusion that the rule violation was not one for which the company would fire even a probationary employee. We have considerable doubt whether the lengthy and detailed investigation into how other asserted violations of the no-pushing rule had been viewed by the company would be warranted in order to enable the Board to find whether respondent was justified as to its action in terminating such probationary employment following a clear violation of an important rule of the company. But, be that as it may, the entire inquiry into this matter brought up nothing to show that the respondent had ever knowingly ignored such a violation. Of course, advance permission to have a particular truck pushed would prevent such action from being a rule violation at all. So, too, a violation which was not brought to the attention of respondent would not prove anything.

Absent any showing that the company's conduct was inconsistent with its policy, there was nothing left but the fact that the respondent's dispatcher had seen Spurlock in the automobile of the union president presumably talking about union matters. There is no evidence that Cunningham knew that Spurlock had worked to organize the union or even that he was a member. On the same or greater showing of union interest by three others, the examiner and the Board found that there could be no inference that a subsequent discharge was discriminatory. As to this, we think the Board was right. The fact that Spurlock had done more on behalf of the union cannot, of course, distinguish his case from the others because the company could not have intended to consider this fact of which it had no knowledge.

■ The burden was on the general counsel to prove that the employer knew

that the employee was engaged in the protected activity and that he was discharged because he had been so engaged. N. L. R. B. v. Sebastopol Apple Growers Union, 9 Cir., 269 F.2d 705. Here he totally failed to prove by substantial evidence, even without considering the countervailing evidence of legal cause, these two essential facts.

We have held that the Board could legally credit the testimony, although contradicted by Cunningham, that he made the two statements in the nature of threats to prevent unionization of the respondent drivers. We must concur, therefore, in the Board's finding respondent guilty of the 8(a)(1) violation.

Enforcement of the order as it relates to the 8(a)(1) violation is Granted. Enforcement as to the reinstatement of Spurlock is Denied.