Arnold L. Kimmes v. Commissioner.Kimmes v. CommissionerDocket No. 79630.United States Tax CourtT.C. Memo 1963-59; 1963 Tax Ct. Memo LEXIS 284; 22 T.C.M. (CCH) 232; T.C.M. (RIA) 63059; February 28, 1963*284 Transferee liability - The transferor corporation transferred all its assets to another corporation in exchange for stock, and such other corporation agreed to pay all its liabilities, including its Federal income tax liability. The transferor corporation thereupon distributed the stock of such other corporation to its stockholders, including the petitioner, and dissolved. Held, that the agreement of such other corporation did not constitute a retained asset of the transferor for purposes of determining whether it was rendered insolvent by the distribution and hence did not relieve the petitioner of liability, as a transferee, for the unpaid income taxes of the transferor corporation. Held further, that the transferor corporation's liability, for which the petitioner is liable as transferee, includes an addition to tax under section 6651(a) of the Internal Revenue Code of 1954, for failure to file a return for its final tax period. The fair market value of the stock received by the petitioner from the transferor corporation upon liquidation established for the purpose of measuring the petitioner's liability as transferee. Stanley L. Drexler, Esq., and Ellis J. Sobol, Esq., Mile High *285 Center, Denver, Colo., for the petitioner. Arthur B. Bleecher, Esq., for the respondent. ATKINSMemorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined that petitioner is liable to the extent of $71,052.63 as transferee of assets of Uranium Drilling Co. for deficiencies in income tax of that company and additions thereto for the years and in amounts as follows: Addition to Tax(Sec. 6651(a)Year EndedDeficiencyIRC 1954)7-31-55$42,676.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,270.31$12,567.58 The issues presented are whether petitioner is liable as a transferee for unpaid taxes of Uranium Drilling Co. and if so to what extent, and whether the failure of the transferor to file an income tax return for the period ended February 26, 1956, was due to reasonable cause and not due to willful neglect, within the meaning of section 6651(a). Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. Uranium Drilling Co., the transferor, hereinafter referred to as Uranium, was a Colorado corporation. On October 9, 1958, the respondent issued a notice of deficiency to Uranium determining the deficiencies in income tax and addition to tax above referred to. *286 Uranium did not file a petition with this Court, and thereupon the district director of internal revenue at Denver, Colorado, assessed the above amounts, and such assessments remained unpaid at the time of the trial. It has been agreed by the parties that the correct amount of deficiencies in income tax due from Uranium are $1,625.59 for the fiscal year ended July 31, 1955, and $30,899.53 for the taxable period ended February 26, 1956. The parties have also agreed that if Uranium is liable for an addition to tax under section 6651(a) of the Internal Revenue Code of 1954 for failure to file an income tax return for the period ended February 26, 1956, the correct amount of such addition is $7,724.88. The petitioner was a stockholder and director of Uranium and was its president. Commercial Uranium Mines, Inc., a Delaware corporation (hereinafter referred to as Commercial), 1*287 was incorporated on June 9, 1954, for the purpose of exploration, development, and operation of uranium mining properties. Its authorized capital stock consisted of 20 million shares of common stock having a par value of 1" per share. On February 25, 1956, the board of directors of Commercial adopted a resolution authorizing its president to issue and deliver to Uranium 5 million shares of its stock in exchange for all the assets of Uranium. On the same date the board of directors of Uranium adopted a resolution accepting the offer of Commercial, subject to the approval of the stockholders, and subject to the condition that the 5 million shares of Commercial be delivered to Uranium within 10 days after the approval of the stockholders, and directing that upon the transfer of the assets and receipt of the Commercial stock steps be taken immediately to liquidate and dissolve Uranium in accordance with the laws of Colorado. At a meeting held on February 26, 1956, the stockholders of Uranium unanimously approved the resolution of the board of directors. The directors of Commercial were Harry C. Gamblin, Clyde D. Moslander, Jr., and James O. Kaysbier; the directors of Uranium were the petitioner and Gamblin and Moslander. Kaysbier was secretary-treasurer of Commercial and treasurer of Uranium. Moslander was secretary of Uranium. On or about March 20, 1956, Commercial *288 issued 5 million shares of its common 1" par value capital stock to Uranium in exchange for Uranium's assets. The exact date of the transfer of Uranium's assets is not shown. As of March 29, 1956, Uranium's books and balance sheet showed assets of $122,164.01, liabilities of $23,233.59, and a net worth of $98,930.42. These assets were reflected in the balance sheet of Commercial as of March 31, 1956. Between the dates of April 14, 1956 and April 20, 1956, the stock of Commercial was distributed by Uranium to its stockholders in exchange for their stock of Uranium. The total outstanding stock of Uranium at the time of exchange was $28,500 shares, of which the petitioner owned 10,000 shares. The petitioner on April 16, 1956, received 1,754,420 shares of Commercial stock in exchange for his 10,000 shares of Uranium stock. At that time the petitioner already owned 2,500,000 shares of Commercial stock. Kaysbier received 394,745 shares of Commercial stock in exchange for 2,250 shares of Uranium. Moslander received 175,445 shares of Commercial stock for 1,000 shares of Uranium stock. Gamblin (in the name of Hazel Gamblin) received 350,880 shares of Commercial stock for 2,000 shares of Uranium*289 stock. At the time of the exchange 1,315,526 shares of Commercial stock were issued to Mildred L. McLaughlin in exchange for 7,500 shares of Uranium stock. Mildred McLaughlin was acting as nominee. Neither the petitioner nor Columbia Securities Co. (hereinafter referred to) had any interest in the shares issued to Mildred McLaughlin. As a part of the transaction between Uranium and Commercial, the latter assumed all the liabilities of Uranium, including Federal and state income taxes. After the exchange Commercial did pay all the liabilities of Uranium other than its income taxes. The transfer by Uranium to its stockholders of the Commercial stock which it had received in the exchange left Uranium without any assets, other than the promise of Commercial to pay its taxes and other debts. Uranium was dissolved on May 1, 1956. Prior to January 16, 1956, Commercial had issued and outstanding 3 million of its 20 million authorized shares of capital stock. On January 16, 1956, a public offering was made of an additional 15 million shares at a price of 2" per share, amounting to $300,000. The underwriter was Columbia Securities Co., 2 which agreed to use its best efforts to sell the securities. *290 The underwriting commissions were to be 25% (which would amount to $75,000 if all the stock was sold) and the underwriter was entitled to expenses of the offer in the amount of $25,000. The underwriter was authorized to form a selling group, the members thereof being afforded the opportunity of buying the shares at a price of 2" per share, less a concession to be agreed upon. Columbia Securities did form a selling group, which included Columbia Securities Co. of Wyoming. 3*291 Purchases were made by the selling group in large amounts. Columbia itself purchased as an investment from the underwriting account 2 million shares of Commercial stock at a price of 1 1/2" per share, the proceeds of $30,000 going directly to Commercial. The selling group generally disposed of the Commercial stock in small lots, amounting to $200 to $300. The period over which the stock was sold and the amount sold is not established by the record. 4Columbia Securities Co. of Wyoming sold 800,000 to 1 million of the shares over a period of approximately one month after the offering date. After the public issuance of the stock of Commercial, it continued to be traded on the market through brokerage firms. One salesman of Columbia Securities Co. of Wyoming made numerous purchases and sales of such stock for the account of her customers over the period from March 29 to May 25, 1956, in lots ranging generally from 1,000 to 5,000 shares and at prices ranging from 4 1/2" *292 per share to 6 1/4" per share. Another brokerage firm, Boettcher & Company, made 3 purchases of stock of Commercial for its customers during March and April 1956, in lots ranging from 500 shares to 5,000 shares, at prices ranging from 3 1/2" to 4 1/2" per share. On June 1, 1956, it purchased 4,000 shares at a price of 5 3/4" per share. Columbia Securities itself made numerous purchases of Commercial sock from or through other brokers. Over the period from January through March 1956, it purchased through the firm of Peters, Writer & Christensen, Inc., one lot of 1,000 shares, 2 of 10,000 shares, one of 40,000 shares, one of 50,000 shares, and one of 200,000 shares. These purchases were made at prices ranging from 2" per share to 4 1/2" per share. In August 1956, it purchased through such firm 1,000 shares at 5 1/4" per share. In addition to the above purchases of Commercial stock made for Columbia Securities, the firm of Peters, Writer & Christensen, Inc. also had numerous other transactions involving the purchase and sale of Commercial stock. Over the period from January 20 through April 30, 1956, these additional transactions involved lots ranging from 2,000 shares to 100,000 shares, *293 at prices ranging from 2 1/2" to 5 1/2" per share. It also had four sales in May at an average price of 5 2/5" per share, one sale in June at a price of 5" per share, one sale in July at a price of 3 3/4", and two sales in August at an average price of 5" per share. During April 1956, the above brokerage firms, Columbia Securities, Boettcher & Company, and Peters, Writer & Christensen, Inc. purchased for customers, other than Columbia Securities, about 400,000 shares and sold for customers about 400,000 shares in lots ranging from 1,000 to 75,000 shares at prices ranging from 2 1/2" to 6" per share, the average selling price per share being about 4 1/4". Price quotations for Commercial stock as shown by the National Stock Summary (commonly known as pink sheets) during March 1956, ranged from a bid of 3" per share to a bid of 4" per share, and from an asking price of 4" per share to an asking price of 5" per share; in May 1956, the bids ranged from 4 1/2" to 5 1/4" per share and the asking prices ranged from 5 1/2" to 6" per share; in August the bids ranged from 4" to 5" per share, while the asking prices ranged from 4 3/4" to 7" *294 per share; and in September the bids ranged from 2 1/2" to 3" per share and the asking prices ranged from 3 1/2" to 5" per share. Such National Stock Summary does not disclose any bid and asked prices for the month of April 1956. The fair market value of the 1,754,420 shares of Commercial stock which the petitioner received from Uranium upon its liquidation on April 16, 1956, was 2" per share, or a total fair market value of $35,088.40. At a meeting of the officers of Commercial and Uranium held in February 1956 to discuss the proposed exchange of assets of Uranium for stock of Commercial, the accountant for Uranium advised the petitioner that Uranium had a responsibility to file an income tax return for its final tax period. At such meeting the president of Commercial, Martin Legere, instructed the accountant to prepare a final tax return for Uranium. It was understood that Commercial was to file the return and pay the tax. At a time not disclosed by the record, the accountant prepared a return for Uranium covering the taxable period ended February 26, 1956 (actually the return purported to cover a full taxable year from August 1, 1955 to July 31, 1956, and was designated "Final Return"), *295 disclosing a tax liability of $29,766.15 and delivered it to Kaysbier, who in turn delivered it to the petitioner. The petitioner signed it as president of Uranium, and then Kaysbier delivered the return to Legere. Such return was never filed with the district director, and Commercial did not pay Uranium's tax liability, although it paid all other liabilities of Uranium. Prior to the time of the above meeting Uranium had sold one of its principal assets, an office building, for $52,500 and the proceeds were held in escrow. Prior to the release of these funds Uranium did not have sufficient funds to pay its income taxes. At the time of the meeting Commercial had in excess of $100,000 in its bank account. Within a short time after the meeting the proceeds from the sale of Uranium's office building were released from escrow, the petitioner endorsed a check for $50,000 ($52,500 sales price, less a $2,500 real estate broker's commission) for Uranium, and delivered the check to Commercial, and Commercial deposited it in its bank account. The failure of Uranium to file an income tax return for the taxable period ended February 26, 1956, was not due to reasonable cause. Opinion The respondent *296 determined that the petitioner is liable as a transferee for the full amount of income tax of Uranium for the taxable year ended July 31, 1955, and the taxable period ended February 26, 1956, and for an addition to tax for the latter period, all totaling $40,250. 5*297 The burden of proof is upon the respondent to establish that the petitioner is liable as transferee, as well as the amount of such liability, but not to establish the amount of the liability of the transferor. Section 6902 of the Code. 6 The parties have agreed that the correct amount of deficiencies in income tax due from Uranium are $1,625.59 for the taxable year ended July 31, 1955 and $30,899.53 for the taxable period ended February 26, 1956. They have also agreed that if Uranium is liable for an addition to tax for the latter period under section 6651(a) of the Internal Revenue Code of 1954, 7 the correct amount of such addition is $7,724.88. The respondent maintains that Uranium did incur a liability for such an addition to tax, and that the petitioner, as transferee, is liable therefor. The petitioner contends that the failure of Uranium to file a return for *298 such period was due to reasonable cause and not to willful neglect and that there is no basis for the assertion of the addition to tax. Whether or not a failure to timely file a return was due to willful neglect, the addition to tax must be made unless such failure has been shown to be due to reasonable cause. Charles E. Pearsall & Son, 29 B.T.A. 747, and Beck Chemical Equipment Corporation, 27 T.C. 840. Reasonable cause has been defined to mean the exercise by a taxpayer of ordinary business care and prudence. Beck Chemical Equipment Corporation, supra; *299 Calvert Iron Works, Inc. 26 T.C. 770; and Robinson's Dairy, Inc., 35 T.C. 601, affd. (C.A. 10) 302 F. 2d 42. The question is essentially one of fact to be decided upon the particular circumstances of each case, and the burden of proof is upon the petitioner. The petitioner contends that Uranium, or he on its behalf as president, exercised ordinary business care and prudence, since a return was prepared by Uranium's accountant and he, the petitioner, signed it as president and Kaysbier, treasurer of Uranium, delivered it to Legere, president of Commercial pursuant to an understanding that Commercial would file the return, and pay the tax in accordance with its agreement. He further points out that Commercial had funds with which to pay the tax. In our opinion the evidence falls short of establishing that the failure to file was due to reasonable cause. Under the revenue statutes Uranium was under a duty to timely file a return for its final tax period, and since a corporation must act through its directors, officers, and employees, there was, we think, under the circumstances of this case, a duty upon the petitioner and others charged with its affairs to ascertain whether the return *300 was filed by Commercial in accordance with the understanding. There is no explanation whatever in the record as to why Commercial, or its president or other representatives, did not file the return. The petitioner testified that after turning the return over to Commercial he knew nothing further about it until Kaysbier, in 1959, was contacted by the Internal Revenue Service with respect to the records of Commercial, and that at that time he, the petitioner, learned that the return had not been filed. But, Kaysbier, being treasurer of Uranium, was also one of its responsible officers. He was also the secretary-treasurer of Commercial. It would seem obvious that he should have known whether Commercial had filed the return and paid the tax. Kaysbier did not testify. It should also be pointed out that two of the three directors of Uranium, namely, Moslander and Gamblin, were also two of the three directors of Commercial. It would seem that they, as directors of Commercial, reasonably should have known whether Commercial had filed the return for Uranium in accordance with the understanding. It may be added that after the exchange the petitioner owned over 1/5 of all the stock of Commercial, *301 having received upon the exchange 1,754,420 shares, and already owning 2,500,000 shares of stock of that corporation; and that Kaysbier, Gamblin, and Moslander also became owners of substantial stock interests in Commercial as a result of the exchange (Gamblin's shares apparently having been taken in the name of Hazel Gamblin). The petitioner relies principally upon Bouvelt Realty, Inc., 46 B.T.A. 45, in which returns were duly prepared and executed by the proper corporate officers and turned over to a corporate employee whose duty it was to file such returns. Such employee had not theretofore failed to properly file returns, but in the instance in question certain returns had been mixed with retained copies of other returns and for that reason were not timely filed. We there held that the failure to file was due to reasonable cause. As previously stated, the question of whether a failure to timely file was due to reasonable cause must be determined upon the basis of the facts in each case. We consider the facts presented in the Bouvelt case substantially different from those presented herein. Upon the basis of the record here presented, we cannot find that the failure to file was *302 due to reasonable cause. We accordingly sustain the determination of the respondent that Uranium is liable for an addition to tax pursuant to section 6651(a) of the Code. When, between April 14 and April 20, 1956, Uranium, the transferor, distributed in liquidation the stock of Commercial to its stockholders, including the petitioner, it was left without any assets out of which the respondent could collect any taxes due and owing from it. Commercial, in consideration of the receipt of Uranium's assets in exchange for its, Commercial's, stock, assumed all the liabilities of Uranium, including Federal income taxes. It is the petitioner's contention that this agreement by Commercial constituted an asset in the hands of Uranium, that Uranium therefore was not rendered insolvent by the transfer of its remaining assets (stock of Commercial) to him and the other stockholders, and that hence he is not liable as a transferee of Uranium. In a number of cases, not involving tax liabilities, it has been held that such an assumption is not an asset which can be levied upon and hence does not relieve stockholders of a transferor corporation of transferee liability arising out of their receipt of *303 assets of the transferor corporation. See Northern Pacific Railway v. Boyd, 228 U.S. 482; Pierce v. United States, 255 U.S. 398; and Bankers Trust Co. v. Hale & Kilburn Corporation, 284 F. 2d 401. And in John N. Humbert, 24 B.T.A. 828, it was held that stockholders of a transferor corporation continued to be primarily liable as transferees despite the fact that the transferor corporation had an agreement with a third party to pay its tax liabilities. Accordingly, we reject this contention of the petitioner. The evidence shows, and the petitioner concedes, that upon the dissolution of Uranium he turned in 10,000 shares of stock of that company and received upon liquidation 1,754,420 shares of Commercial stock. The respondent contends that 7,500 shares of Uranium stock which were held by Mildred L. McLaughlin as nominee were in reality held for Columbia Securities Co., a Utah corporation which was owned to the extend of 87 1/2% by petitioner, and that 87 1/2% of the Commercial stock received by Mildred L. McLaughlin as nominee for Columbia Securities Co., or 1,151,085.25 shares of Commercial, should be considered as received by petitioner upon the liquidation of Uranium. As indicated *304 above, the respondent has the burden of showing the amount of the petitioner's liability as transferee. Upon the record we are not satisfied that any portion of the 7,500 shares of Uranium stock held by Mildred L. McLaughlin as nominee was held for Columbia Securities Co. The petitioner testified that such shares were not held as nominee for either him or Columbia Securities Co., but, rather, for one Louis Millman and other individuals. Accordingly, we have concluded and have found as a fact that the petitioner, at the time of the liquidation of Uranium, held 10,000 shares of its stock, for which he received 1,754,420 shares of Commercial stock. The parties are in disagreement as to the fair market value of the Commercial stock for purposes of measuring the petitioner's transferee liability. The petitioner contends that March 20, 1956, should be taken as the date he received the Commercial stock, because it was on or about that date that Commercial issued 5,000,000 shares of its stock to Uranium in exchange for Uranium's assets, and because, he claims, at that time he and the other stockholders had a clear right to receive such stock in liquidation of Uranium. The respondent, on the *305 other hand, contends that the proper date for valuation is April 16, 1956, the date that the petitioner actually received the 1,754,420 shares of Commercial stock upon surrender of his stock of Uranium. We agree with the respondent. Until that date the 1,754,420 shares of stock in question remained as assets held by Uranium subject to the claims of creditors; until that date the petitioner had not incurred a transferee liability by withdrawing any assets from Uranium. The respondent contends that the stock of Commercial had a fair market value, at the date of receipt, of 4" per share, whereas the petitioner contends that its fair market value was approximately 1" per share. The evidence shows that the assets transferred by Uranium in exchange for 5,000,000 shares of Commercial stock were carried on the books of both Uranium and Commercial at the end of March 1956, at a net value of $98,930.42. It appears, therefore, that between the parties to the exchange the 5,000,000 shares of Commercial stock were considered as having a value of approximately 2" per share. The evidence shows that during April 1956, 3 brokerage firms sold about 400,000 shares of Commercial stock for their customers *306 at an average price of about 4 1/4" per share. These sales involved varying amounts of stocks, and the petitioner correctly contends that they do not establish the fair market value of a block of 1,754,420 shares of such stock. To throw such a block of stock on the market at one time would depress the market and to sell it in smaller lots would involve time and expense. The petitioner presented as witnesses two stock brokers who dealt in Commercial stock. One of them, Howard P. Carroll, testified that in his opinion a block of about 1,750,000 shares of Commercial stock would, between the period February 26, 1956 through May 1, 1956, have a market value of about 1/3 of the bid price. Another, John T. Webb, testified that in his opinion the fair market value of such a block of Commercial stock would have been approximately one-half the bid price. The evidence shows that the bid prices ranged from 3" to 4" per share in March 1956, and from 4 1/2" to 5 1/4" per share in May 1956. There is no evidence of any bid prices during April 1956. The petitioner himself testified that he did not know the fair market value of this block of stock; that it was purely speculative; and that the value *307 depended upon the ability to sell. He further testified that to dispose of a block of 1,750,000 shares of Commercial stock it would have to be done through Columbia Securities Co., and that it would have taken longer than a month. It may be added that the petitioner would have been in a particularly favorable position to effect a disposition of such stock since he controlled Columbia Securities Co., which, together with its affiliated companies, was well organized to dispose of such stock, having underwritten the public offering of 15,000,000 shares of Commercial stock in January of the same year. Based upon the record as a whole and giving due consideration to all the evidence, including the opinion evidence, we have exercised our best judgment and have concluded and found as a fact that on or about April 16, 1956, the petitioner's block of 1,754,420 shares of Commercial stock had a fair market value of 2" per share, or a total fair market value of $35,088.40. Accordingly, the petitioner's liability as a transferee for the taxes, and any additions thereto, of Uranium for the taxable year ended July 31, 1955 and the taxable period ended February 26, 1956, owing at the time of transfer *308 of the stock to petitioner, is measured by the amount of $35,088.40, plus interest thereon as provided by law. The respondent on brief, for the first time, makes the contention that since the petitioner was a director of Uranium, his liability as a transferee is measured by the fair market value of all the 5,000,000 shares of Commercial stock distributed by Uranium to its stockholders upon its liquidation, relying upon section 31-6-1 of the Colorado Revised Statutes (1953). 8*309 In the notice of transferee liability, in the answer, and at the trial, the only basis for the respondent's assertion of a transferee liability against the petitioner was that the petitioner as a stockholder had received assets of Uranium upon its dissolution. Rule 14(b) of the Rules of Practice of this Court requires that the answer filed by the respondent "shall contain * * * a statement of any facts upon which the Commissioner relies * * * to sustain any issue raised in the petition in respect of which issue the burden of proof is, by statute, placed upon him." As we read the cited Colorado statute, the directors, upon dissolution of a corporation, are jointly and severally liable to creditors, to the extent of the property which comes into their hands, only if there has not been a proper and faithful discharge of their trust duties. In his answer *310 the respondent did not refer to such statute of Colorado or allege any facts directed at showing that the petitioner and the other directors failed to discharge their duties properly and faithfully. The issue which the respondent attempts to raise on brief would thus involve matters as to which, at the time of trial, the petitioner had not been apprised by the pleadings. Under the circumstances, we hold the issue of liability under the cited Colorado statute is not properly before us. Decision will be entered under Rule 50. Footnotes1. Later, in August 1956, its name was changed to Commercial Minerals Corporation, and still later to Commercial International Corporation.2. Columbia Securities Co., a Utah corporation located in Denver, Colorado, was a large dealer in penny uranium stocks during the period in question. It was owned to the extent of 87 1/2% by the petitioner. Columbia in turn controlled other companies which dealt in penny uranium stocks, including Columbia Securities Co. of Wyoming, and Columbia Securities Co. of New York, which participated in the marketing of the Commercial stock.↩3. See footnote 2, supra. Columbiaalso utilized many other outlets for the purpose of disposing of the Commercial stock.4. Since there were already 3 million shares of stock of Commercial outstanding at the time of the public offering, and since 5 million shares were transferred by Commercial to Uranium in March 1956, and since the total capitalization of Uranium was 20 million, the logical conclusion is that no more than 12 million shares were sold in connection with the public offering.↩5. SEC.0 6901 OF THE Internal Revenue Code of $ provides in part: (a) Method of Collection. - The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the Labilities were incurred: (1) Income, Estate, and Gift Taxes. - (A) Transferees. - The liability, at law or in equlty of a transferee of property - (i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes) * * * in respect of the tax imposed by subtitle A or B. * * *(b) Liability. - Any liability referred to in subsection (a) may be either as to the amount of tax shown on a return or as to any deficiency or underpayment of any tax. * * *(h) Definition of Transferee. - As used in this section, the term "transferee" includes * * * [a] distributee * * *. ↩6. SEC. 6902. PROVISIONS OF SPECIAL APPLICATION TO TRANSFEREES. (a) Burden of Proof. - In proceedings before the Tax Court the burden of proof shall be upon the Secretary or his delegate to show that a petitioner is liable as a transferee of property of a taxpayer, but not to show that the taxpayer was liable for the tax * * *.↩7. SEC. 6651. FAILURE TO FILE TAX RETURN. (a) Addition to the Tax. - In case of failure to file any return required under authority of subchapter A of chapter 61 * * * on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate.↩8. Such section provides in part: 31-6-1. Dissolution - Duties of trustees. - Upon dissolution by expiration of its charter, or otherwise, of any corporation now existing or which may hereafter be formed, unless some other person be appointed by some court of competent jurisdiction, the board of directors or trustees of such corporation or the managers of the corporate affairs, by whatever name known, acting last before the time of its dissolution, and the survivors of them, shall be the trustees of the creditors and stockholders of the corporation dissolved. The said trustees shall have full power * * * to divide the residue of the moneys and property * * * after payment of debts * * * among the stockholders * * *. All such trustees shall be jointly and severally liable to the creditors and stockholders of such corporation dissolved, to the extent of the property and effects which shall come into their hands or possession of any of them, for a proper and faithful discharge of the duties of said trust and disposal of said property and effects.